[Cite as *State v. Sales*, 2011-Ohio-2505.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 25036 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DONTE M. SALES | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 09 01 0110 |

DECISION AND JOURNAL ENTRY

Dated: May 25, 2011

WHITMORE, Judge.

**{¶1}** Defendant-Appellant, Donte M. Sales, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I

**{¶2}** On the morning of January 9, 2009, Sales was involuntarily committed to Portage Path Psychiatric Emergency Services. Akron Police Lieutenant Richard Edwards was working security at the facility when Sales exited the secured area where he was being held to use the restroom that was located in the lobby area. While walking through the lobby, Sales turned around, ran at Lt. Edwards, punched him in the face, and knocked him to the ground, rendering him unconscious. Sales lay on top of Lt. Edwards and began choking him with one hand, while using his other hand to reach for Lt. Edwards's firearm and yelling "I'm going to kill you mother fu\*\*ers." Several workers at the facility helped restrain Sales and remove him from atop Lt. Edwards, while others called 911 for assistance.

{¶3}     Based on these events, Sales was indicted on the following counts: aggravated robbery, a violation of R.C. 2911.01(B), a felony of the first degree; attempted murder, in violation of R.C. 2903.02(A)/(B), a felony of the first degree; felonious assault, in violation of R.C. 2903.11(A)(1), a felony of the first degree; and aggravated menacing, in violation of R.C. 2903.21, a misdemeanor of the first degree.  The foregoing offenses all carried an attendant repeat violent offender specification under R.C. 2941.149.  Following a jury trial, Sales was found guilty of aggravated robbery, attempted murder, and felonious assault and their accompanying specifications, but was acquitted of the aggravated menacing charge.  Sales was sentenced to an aggregate term of twenty-two years in prison.

{¶4}     Sales now appeals from his convictions, asserting two assignments of error for our review.  We have rearranged his assignments of error for purposes of our review.

II

Assignment of Error Number Two

"THE DEFENDANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶5}     In his second assignment of error, Sales argues that his convictions are against the manifest weight of the evidence.  We disagree.

{¶6}     When considering a manifest weight argument, this Court:

"[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio App.3d 339, 340.

A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other.  *Thompkins*, 78 Ohio St.3d at 387.  Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the

evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin* (1983), 20 Ohio App.3d 172, 175; see, also, *Otten*, 33 Ohio App.3d at 340.

{¶7} The jury convicted Sales of aggravated robbery under R.C. 2911.01(B) which provides, in relevant part, that:

> "No person *** shall knowingly remove or attempt to remove a deadly weapon from the person of a law enforcement officer, or shall knowingly deprive or attempt to deprive a law enforcement officer of a deadly weapon, when *** [t]he law enforcement officer, at the time of the removal, attempted removal, deprivation, or attempted deprivation, is acting within the course and scope of the officer's duties [and] [t]he offender knows or has reasonable cause to know that the law enforcement officer is a law enforcement officer."

"A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶8} Sales was also convicted of attempted murder under R.C. 2903.02(A)/(B), which provides that "[n]o person shall purposely cause the death of another[,]" or "cause the death of another as a proximate result of *** committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). Criminal attempt occurs when the offender commits an act constituting a substantial step towards the commission of an offense. *State v. Woods* (1976), 48 Ohio St.2d 127, paragraph one of the syllabus,

overruled on other grounds by *State v. Downs* (1977), 51 Ohio St.2d 47, 53. A "substantial step" includes conduct that is "strongly corroborative of the actor's criminal purpose." Id.

{¶9} The jury also found Sales guilty of felonious assault under R.C. 2903.11(A)(1), which makes it unlawful to "knowingly *** [c]ause serious physical harm to another[.]" "Serious physical harm" is defined to include "[a]ny physical harm that carries a substantial risk of death; *** that involves some temporary, substantial incapacity; [or] *** that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain[.]" R.C. 2901.01(A)(5)(b)-(e).

{¶10} At trial, Lt. Edwards testified that on January 9, 2009, he was working as a security officer for Portage Path Psychiatric Emergency Services. He was wearing his Akron Police uniform, equipped with his utility belt and firearm, while manning the security desk located in the front lobby. The last thing Lt. Edwards recalled before being knocked unconscious was standing at his desk reaching into a drawer to retrieve a set of keys. When he regained consciousness, he was on the floor, and recalled Sales being underneath him. Lt. Edwards stated he was fading in and out of consciousness and, while doing so, heard staff from the facility calling his name. He also felt Sales squeezing his throat "trying to choke [him]" and "tugging on [his] side" where he kept his firearm holstered in his utility belt. After the attack, Lt. Edwards had a headache, felt "nauseous and lightheaded," and thought he might have broken his jaw because "[his] face was going numb" in the area where Sales struck him. Lt. Edwards went to the emergency room at St. Thomas Hospital where he was evaluated and released, having been diagnosed with a mild concussion after suffering a loss of consciousness. Lt. Edwards further testified that, since the attack, he has had intermittent headaches and nausea, in addition to the onset of jaw pain from a separated root in one of his wisdom teeth.

{¶11} Several witnesses who were near the lobby area and witnessed the attack that day also testified. Barbara Medlock, a nurse coordinator at the facility, testified that she saw Sales turn from the direction in which he was walking, run over to Lt. Edwards and hit him in the face, knocking both men to the ground and causing Sales to land on top of Lt. Edwards. Medlock yelled for help and went to the nurses' station to call 911 for assistance. Though she could not see Lt. Edwards's face, she testified he was "not moving at all" and was not resisting or struggling in response to Sales's attack. While she was calling 911, four other employees, including Robin Senf and Jason Aldridge, were trying to restrain Sales and move him off of Lt. Edwards. She noted that once Lt. Edwards regained consciousness, he was dazed and gray in color, and it was evident to her that, despite his claim that he was "okay," he was not.

{¶12} Senf, also a nurse at the facility, testified that she saw Sales initially heading toward the restroom, but that he "spun around [with] his fist up, *** and sprinted toward [Lt. Edwards]." According to Senf, after striking Lt. Edwards, Sales fell on top of him and the two were lying between the desk, the wall, and a nearby support column, which made it difficult for her to see the men and to later remove Sales from atop Lt. Edwards. When she approached, she realized Lt. Edwards was "unresponsive, *** gurgling[,] *** [and] making terrible noises." Senf was the first to attempt to remove Sales from Lt. Edwards. While doing so, she saw Sales with one hand on Lt. Edwards's throat, while the other hand was reaching toward the area of Lt. Edwards's waist. At some point in the attack, Sales also yelled "I'm going to kill you mother fu**ers." Senf was unable to restrain Sales by herself, but was soon aided by Aldridge and other co-workers. Once they were able to remove Sales, Senf noticed that Lt. Edwards looked "pasty," had "unfocused" eyes, and generally, "was not acting right," despite repeatedly stating that he was feeling fine.

{¶13} Senf admitted on cross-examination that, when asked by police to describe what had happened, she did not relay the statement that Sales had made about killing everyone, noting that she was not asked about what he said, but more so about what he did. On redirect examination, she indicated that she "was in shock" after the events and may not have informed police of that statement in her taped statement, but thought she did in her written statement.

{¶14} Aldridge, a mental health technician at the facility, testified that Sales had asked him if he could be released from the secured area to use the restroom in the lobby. Aldridge complied, and the next thing he heard was a large crash. When Aldridge turned toward the sound, he saw the chair and desk contents from Lt. Edwards's desk falling to the floor. He then saw Lt. Edwards on his back, with Sales lying on him. Senf was already there, pulling at Sales's waist to get him off of Lt. Edwards. Aldridge saw Sales choking Lt. Edwards with one hand, while reaching toward the lieutenant's gun holster with his other hand. According to Aldridge, while they were restraining Sales's hands, he said "you dirty mother fu**ers, I'm going to kill you all." Once additional staff and Akron police arrived, Sales stopped struggling, and was taken to a secured area, placed in bed restraints, and medicated. Aldridge described Lt. Edwards as "totally unresponsive" throughout the entire event and explained that once he regained consciousness and was up on his feet, that he was "very foggy" and discolored in appearance.

{¶15} Susan McMillen, a counselor at the facility, testified in similar fashion. She stated that she did not see Sales attack Lt. Edwards, but instead, heard a "loud crack" which caused her to come out from her office into the lobby. She saw Sales lying on Lt. Edwards with his hand on the lieutenant's throat and the other hand reaching for his gun. She recalled Aldridge saying "[Sales is] going for [Lt. Edwards's] gun" and when she looked, she saw Sales trying to get the gun out of the holster on Lt. Edwards's utility belt. McMillen was one of the first

employees to call 911, but she hung up when she heard a "strangling, gurgling sound" coming from Lt. Edwards and ran back to the lobby. At that point, she heard Sales threatened to kill everyone, and she heard him repeat it again before he was fully restrained. McMillen "thought [Lt. Edwards] was dead" because she saw him lying on the floor with his mouth and eyes wide open, motionless. Once staff and police restrained Sales, Lt. Edwards was helped off the floor, but appeared "dazed [and] *** disoriented." McMillen admitted on cross-examination that she did not make a statement to police that night about what she observed.

{¶16} Sales called three witnesses in his defense. The emergency room physician who examined Lt. Edwards that night, Dr. David Custodio, testified that he ordered two cat scans and a jaw x-ray based on Lt. Edwards's complaint that night. Dr. Custodio diagnosed Lt. Edwards as having a concussion with loss of consciousness, cervical strain, and facial contusions. Dr. Custodio recorded Lt. Edwards as being in a moderate amount of pain based on Lt. Edwards's statements to him, and recorded his condition as "improved" when he left the emergency room. Upon cross-examination by the State, Dr. Custodio stated that, while Lt. Edwards was unconscious on the floor, he would have been "completely incapacitated[.]"

{¶17} Sales's psychotherapist, Curtis Williams, testified that, at the request of Sales's mother, he went to Portage Path Psychiatric Emergency Services early in the day on January 9, 2009, to see Sales. Curtis testified that Sales was "agitated" and had a difficult time recognizing Curtis. Curtis was concerned that Sales would be released over the weekend and, if there was not an adequate discharge plan in place, would not be under any professional care at that time. Curtis met with the head nurse to explain his concerns, and then left the facility, before Sales attacked Lt. Edwards.

{¶18} Sales's mother, Deniela Williams, testified that she was in the lobby of the facility almost the entire day, and had contacted Sales's psychotherapist to come to the facility to try to help with treating her son. They both stayed throughout the day and talked to the staff about Sales's condition and care. She stated that Sales seemed "very agitated" and "sort of aggressive" when she was there. Deniela left the facility before Sales attacked Lt. Edwards and when she returned just hours later, Sales had already been transferred to the police station. Following the testimony from Sales's mother and psychotherapist, the trial court instructed the jury that diminished capacity is not a recognized defense in Ohio.

{¶19} Based on the foregoing evidence, we conclude that the jury did not lose its way in finding Sales guilty of aggravated robbery, attempted murder, and felonious assault. Though Sales challenges whether the evidence demonstrated that Lt. Edwards suffered any "temporary, substantial incapacity" to support his conviction for felonious assault, we conclude that the loss of consciousness, irrespective of its duration, satisfies that definition. See, e.g., *State v. Redwine*, 12th Dist. No. CA2006-08-011, 2007-Ohio-6413, ¶32 (concluding that "[l]osing consciousness as a result of an assault constitutes serious physical harm"); *State v. Bradford*, 9th Dist. No. 22441, 2005-Ohio-5804, at ¶19 (noting that, where the victim lost consciousness, the jury could have found that "serious physical harm" element of felonious assault had been established); *State v. Jones* (Sept. 7, 1999), 12th Dist. No. CA98-10-222, at *9 (concluding that "[t]emporary unconsciousness is sufficient to establish a 'temporary, substantial incapacity'"). Moreover, "serious physical harm" can be inferred under R.C. 2901.01(A)(5) "[w]here injuries are serious enough to cause [the victim] to seek medical treatment," as was the case here. *State v. Lee*, 6th Dist. No. L-06-1384, 2008-Ohio-253, at ¶30, quoting *State v. Lee*, 8th Dist. No. 82326, 2003-Ohio-5640, at ¶24.

{¶20} Sales also alleges that the testimony of the State's witnesses was inconsistent as to whether Sales made a substantial attempt to take Lt. Edwards's gun or to harm others in the facility. This Court has noted, however, that it is not uncommon for witnesses' recollections of events or assailants to vary slightly where they have been subjected to stressful and potentially life-threatening situations. See, e.g., *State v. Sykes*, 9th Dist. No. 25263, 2011-Ohio-293, at ¶21, citing *State v. Singfield*, 9th Dist. No. 24576, 2009-Ohio-5945, at ¶19. Moreover, it is within the province of the jury "to take note of the inconsistencies [in the witnesses' testimony] and resolve or discount them accordingly." *State v. Gooden*, 9th Dist. No. 24896, 2010-Ohio-1961, at ¶30. Though slightly differing in their recollection of Sales's attempt to obtain Lt. Edwards's gun, we cannot conclude that, based on these discrepancies, the jury lots its way in convicting Sales of aggravated robbery. Finally, with respect to Sales's attempted murder conviction, there was consistent testimony that, after knocking Lt. Edwards to the ground, Sales used one hand throughout the attack to choke Lt. Edwards, while at the same time reaching for Lt. Edwards's gun with his other hand and threatening to kill everyone in the facility. For these reasons, we conclude that Sales's convictions are not against the manifest weight of the evidence. Consequently, his second assignment of error is overruled.

Assignment of Error Number One

"THE COURT ERRED IN FAILING TO ADMIT TAPED WITNESS STATEMENTS CONTRADICTING TRIAL STATEMENTS MADE BY THE WITNESSES ON FACTS MATERIAL TO THE CASE."

{¶21} In his first assignment of error, Sales argues that the trial court erred by denying his request to admit into evidence the audio tapes of statements made by several witnesses when they were interviewed by police after the incident. Sales argues that the trial court properly permitted the tapes to be played for the jury during the trial, but erred when it failed to allow

them to be admitted into evidence and available to the jury during its deliberations pursuant to Evid.R. 613(B), 803(2), and 803(8). We disagree.

{¶22} "The trial court is afforded broad discretion in ruling on the admissibility of evidence, and its decision will not be overturned unless there is a clear abuse of discretion and material prejudice to the defendant." *State v. McDaniel*, 9th Dist. No. 05CA008690, 2005-Ohio-5809, at ¶9, citing *State v. Hymore* (1967), 9 Ohio St.2d 122, 128. An abuse of discretion means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, this court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 621.

{¶23} The record reflects, and Sales argues to this Court, that he sought to have the tapes introduced into evidence for the purposes of impeachment pursuant to Evid.R. 613(B). Evid.R. 613(B) provides, in relevant part, that:

> "Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:
>
> "(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require; [and]
>
> "(2) The subject matter of the statement is one of the following:
>
> "(a) A fact that is of consequence to the determination of the action other than the credibility of a witness[.]"

Though not specified in his brief, Sales utilized the tapes at trial to impeach the credibility of two different witnesses with respect to the statements they made to police: Senf and Aldridge.

{¶24} With respect to Senf's testimony, on cross-examination, the following exchange occurred between Sales's counsel and Senf:

"[COUNSEL]: In [the police] recording, did you say anything about I'm going to kill all you MFs? Did you state that to him?

"[WITNESS]: I don't recall.

"[COUNSEL]: Okay. So you might not have?

"[WITNESS]: I don't know.

"***

"[COUNSEL]: Ma'am, I'm going to play a copy of that taped statement *** and ask if you can listen to it and tell me if you recall that conversation.

"***

"[COUNSEL]: Because the statement that you claim [] Sales made that he's going to kill all you MF'rs, I asked you if that was in your taped statement, and I don't think you knew? And I want to play that statement for the jury at this time."

The trial court permitted Sales to play the taped statement Senf gave to police on the day of the attack. After the taped interview was played for the jury, Senf confirmed that she was the speaker and further agreed with defense counsel's statement that she had not told police that Sales had "sa[id] something about killing everyone" when she gave them her statement. Upon redirect examination, however, the State clarified that the question posed by police to Senf was "what happened" that day and that she was "never asked [by police] what [Sales] said[.]" Senf further testified that, if she was asked by police if Sales had said anything, she would have told them, and agreed that she might have told another officer who prepared her written statement, but not the officer that she spoke with in her recorded statement. Because the taped statement is silent on this issue and Senf later testified with additional information about what she recalled, we cannot conclude that the contents of the tape contain evidence of a prior inconsistent statement. See, e.g., *State v. Blazer*, 8th Dist. No. 93980, 2010-Ohio-6367, at ¶30-33 (concluding that witnesses' response did not constitute a prior inconsistent statement, but permitting it for impeachment purposes). Instead, it is apparent that, despite testifying about

Sales's threat to kill everyone, she was unable to recall what she told police, but upon having her recollection refreshed, she agreed that this issue was not included in her taped interview with police. Accordingly, the trial court did not abuse its discretion in failing to admit the tapes as extrinsic evidence of a prior inconsistent statement under Evid.R. 613.

{¶25} Sales's counsel also questioned Aldridge with respect to the statements he provided to police after the attack. On direct examination, Aldridge testified that while Sales was lying on top of Lt. Edwards, "he was choking [Lt. Edwards] with one hand[ and] [t]he other hand was situated at the belt, around the holster." Aldridge testified that he also saw Sales's hand on Lt. Edwards's gun. On cross-examination, the following exchange occurred between Sales's counsel and Aldridge:

> "[COUNSEL]: And one hand that you say is in the area of [Lt. Edwards's] utility belt or holster?
>
> "[WITNESS]: It was on the holster.
>
> "[COUNSEL]: Okay. The statement you gave to [the police], did you state that? Did you say that his hand was on the holster?
>
> "[WITNESS]: I gave that statement eight months ago. I -- I can't be exactly sure exactly what I said.
>
> "[COUNSEL]: Was that statement given shortly after the incident itself?
>
> "[WITNESS]: Within a few hours.
>
> "***
>
> "(*** a portion of a taped interview was played for the jury.)
>
> "[COUNSEL]: Did you hear that part about the gun?
>
> "[WITNESS]: I did.
>
> "[COUNSEL]: And I want to restate it so that it's clear to the jury.
>
> "Your statement was it looked like he was reaching for his gun. And then you said, well, he was reaching for the side where his gun was. Is that a fair characterization of how you describe the gun reach on that day?

"[WITNESS]:  It is.

"[COUNSEL]:  And then after that, you don't talk about the gun for the rest of the interview?

"[WITNESS]:  I don't know.  I haven't heard the rest of the interview.

"[COUNSEL]:  I'm sorry.  That's not a fair question.  I apologize.

"(Whereupon, a portion of the taped interview was played for the jury.)

"[COUNSEL]:  So as far as the gun goes, [] Aldridge, the statement you made to [the police], which was the same date as the incident, it looked like he was reaching for his gun, and then, he was reaching for the side where the gun was. Fair characterization of what you said on that day?

"[WITNESS]:  Sure.

"***

"[COUNSEL]:  From what you described and what you saw involving the gun, would there be any fingerprints on the gun?

"[WITNESS]:  I can't answer that question.

"***

"[COUNSEL]:  Did you see [Sales's] hand on the gun?

"[WITNESS]: There's the belt.  Here's the holster.  Here's the gun (indicating).

"Someone's hand is on that belt near that holster.  I don't know if there would be fingerprints on the gun.  There might be on the actual holster.  I don't know.  I -- there was not time to micromanage every detail."

Upon redirect examination, Aldridge confirmed that he had told the police that Sales had begun to grab Lt. Edwards's duty belt in an attempt to get his weapon, and that Sales was starting to tug on the firearm when Aldridge grabbed his arm.  Based on this testimony, we do not consider the discrepancies to be so vastly different that they constitute a prior inconsistent statement.  See, e.g., *State v. Theuring* (1988), 46 Ohio App.3d 152, 155 (concluding that, where a witnesses' prior statement to police regarding the timing of and his distance from a car accident and his testimony at trial differed slightly, "[t]he two statements [we]re not so divergent as to be

irreconcilable"). Moreover, to the extent that Aldridge's statements could be considered inconsistent, he admitted to having made such statements to the police. "If a witness denies making a statement and the issue is not collateral, then extrinsic evidence is admissible to impeach the witness. However, if a witness admits making the conflicting statement, then extrinsic evidence of the prior statement is not admissible." (Internal citations omitted.) *State v. Mulvey*, 7th Dist. No. 08 BE 31, 2009-Ohio-6756, at ¶68. Accord *Thuering*, 46 Ohio App.3d at 155; *State v. Haynes* (Nov. 5, 1997), 9th Dist. Nos. 17865 & 17903, at *3. Accordingly, the trial court did not abuse its discretion in failing to admit the tapes as extrinsic evidence because, to the extent there were any inconsistencies in his statements, Aldridge admitted to making them.

{¶26} Finally, we note that at trial, Sales did not seek to have the taped statements admitted as an exception to hearsay as an excited utterance pursuant to Evid.R. 803(2) or a business record pursuant to Evid.R. 803(8), nor has he argued plain error on appeal. Accordingly, we decline to engage in a plain error analysis on his behalf. *State v. Porter*, 9th Dist. No. 24996, 2010-Ohio-3980, at ¶20. Accordingly, Sales's first assignment of error is overruled.

### III

{¶27} Sales's two assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

CARR, J.
CONCURS

BELFANCE, P. J.
CONCURS IN JUDGMENT ONLY

APPEARANCES:

SCOT A. STEVENSON, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.