[Cite as *State v. Watson*, 2015-Ohio-4517.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 26347 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 13-CR-2983 |
| v. | : | |
| | : | (Criminal Appeal from |
| LYNNTONIO WATSON | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of October, 2015.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

JEFFREY T. GRAMZA, Atty. Reg. No. 0053392, Talbott Tower, Suite 1210, 131 North Ludlow Street, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant Lynntonio Watson appeals from his conviction and

sentence for Murder, Felonious Assault, and Having a Weapon While Under a Disability. Watson contends that the State did not present evidence sufficient to support the convictions, and that the convictions are against the manifest weight of the evidence. He further contends that the trial court erred by preventing trial counsel from impeaching one of the victim witnesses on cross-examination.

{¶ 2} We conclude that there is sufficient evidence in the record to sustain the convictions, and that the convictions are not against the manifest weight of the evidence. We further conclude that the trial court did not abuse its discretion with regard to the admission of impeachment evidence.

{¶ 3} Accordingly, the judgment of the trial court is Affirmed.

## I. The Shooting

{¶ 4} One day in early September 2013, Shamarr Bodine, his cousin Martell Gray, and his friend Robert Wood met at Bodine's residence. From there, they traveled to the Whitney Young Estates apartment complex at the intersection of Liscum Drive and Germantown Pike in Dayton. Once there, Bodine, Wood and Gray stopped to speak with some people Bodine knew. While talking, the group noticed a male with dreadlocks, later identified as Watson. Bodine stated that he recognized Watson's face, having seen Watson about fifteen times in the past. When the group finished talking, Bodine, Gray, and Wood proceeded to an apartment, where they talked to a friend of Bodine's. They arrived at the apartment some time after 11:00 a.m., and left a few minutes later.

{¶ 5} As they were crossing Liscum Drive, Bodine noticed Watson, a man Bodine and Wood knew as Darryl, and a third man approaching them. When they were standing

on Liscum Drive to the side of an apartment located at 4700 Germantown Pike, Watson asked Bodine if he was Shamarr, and then said, "[y]ou said you know me." Bodine answered that he had seen Watson "around." Watson then said that Bodine had accused him of killing Bodine's brother. At that point Watson drew a gun, told the trio not to move, and immediately began firing at them.

{¶ 6} According to Wood, Watson shot at Bodine, then at him. Wood was shot in the front of his left shoulder. He observed that Watson was the only person shooting. Wood then ran toward a nearby carwash located on Germantown Pike. The car wash was to the west of where Watson pulled the gun. While Wood was running, he heard continued gunfire.

{¶ 7} Bodine testified that as soon as Watson pulled the gun, he ran back across Liscum Drive toward the apartment the trio had just left. He ran in a northwesterly direction. He had been shot twice. When he entered the apartment building, he continued to hear gunfire.

{¶ 8} At 11:40 a.m., Dayton Police Department Dispatch issued a call regarding a shooting at 4700 Germantown Pike. Officers arrived on the scene within four minutes of the dispatch, encountering Bodine and Wood, who had suffered gunshot wounds. Dayton Police Officer Matthew Osterday testified that he heard a woman yelling that a body was located at 1526 Liscum Drive. As Osterday approached, he observed Gray on the ground gasping for breath. Gray was unable to speak, and died after two or three breaths. Gray had six gunshot wounds located on his head, left upper arm, left forearm, left lateral chest, and right shoulder. The bullets to the head and the chest resulted in fatal injuries.

**{¶ 9}** Police found seven .45 caliber shell casings at the spot where the shootings began. The casings were comprised of different brands of ammunition. Three more .45 caliber shell casings were found by Gray's body.

**{¶ 10}** It was determined that of the first seven casings (identified as A, B, C, E, F, G and I) located, five (A, C, E, F, and I) had distinguishing marks indicating that they were discharged from the same gun. Those casings included Remington Peter, Winchester and Blazer brands ammunition. The remaining two casings (identified as B and G) consisted of one Federal and one Remington Peter brand, and likewise had distinguishing marks indicating that those two had been discharged from the same gun. The State's forensic firearms examiner testified that while he believed the two sets of casings had been fired from different guns, he could not definitively determine whether all seven were discharged from the same firearm, or from two separate firearms. Additionally, the three shell casings found by Gray's body were determined to have been from a .45 caliber gun. These included two Federal and one Winchester brand ammunition. The expert was able to determine that all three casings found by Gray's body were from the same gun as the two casings labelled B and G.

**{¶ 11}** On the day of the shooting, the Dayton detective who was assigned as the lead investigator went to the Miami Valley Hospital to speak to Wood. Wood described what happened, but said that he did not know who shot him. Wood then signed a non-prosecution form.

**{¶ 12}** Bodine was released from the hospital. He met Detective House at the detective section of the Safety Building. Bodine described the shooter as having

shoulder-length black dreadlocks.

{¶ 13} Within two days, the police developed Watson as a suspect. House prepared a photo-array spreadsheet containing Watson's picture. Detective Cope showed the array to Wood on September 10, 2013, while Wood was still in the hospital. Wood stated that he did not want to pursue charges, but he pointed to Watson's picture in the array. Wood refused to circle the picture, or to sign the array. The following day, Bodine was shown the array by Sergeant Blommel. Bodine immediately pointed to Watson's picture.

{¶ 14} Watson was arrested in September 2013. At that time, he was a passenger in a vehicle driven by his wife. Watson's dreadlocks were dyed bright red on the tips. Following a consent to search the car, the police found a suitcase and a garbage bag in the trunk. The garbage bag contained male clothing, some paperwork bearing Watson's name, a purple Crown Royal bag, and a white shopping bag. The Crown Royal bag contained thirteen loose rounds of Federal brand .45 caliber ammunition. The white shopping bag contained a fifty-count box of Federal brand .45 caliber ammunition, with twenty of the rounds missing. The suitcase contained prescription medication bottles bearing Watson's name. Watson admitted ownership of the clothing, but denied that the ammunition was his.

## II. The Course of Proceedings

{¶ 15} Watson was indicted on two counts of Murder, six counts of Felonious Assault, and one count of Having a Weapon While Under a Disability. The Murder and Felonious Assault counts were accompanied by firearm specifications.

{¶ 16} Watson waived his right to a jury trial with regard to the count of Having a Weapon While Under Disability. The trial court found him guilty on that count. The remaining charges were tried to a jury. The State asked for, and received, a jury instruction on Complicity, in accordance with R.C. 2923.03(A)(2). Watson was convicted on all counts.

{¶ 17} The trial court sentenced Watson to an aggregate sentence of 37 years to life in prison. Watson appeals.

### III. The Judgment Is Supported by Sufficient Evidence, and Is Not Against the Manifest Weight of the Evidence

{¶ 18} Watson's First Assignment of Error states:

THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND THE EVIDENCE PRESENTED WAS INSUFFICIENT, AS A MATTER OF LAW, TO PROVE THE APPELLANT'S GUILT BEYOND A REASONABLE DOUBT.

{¶ 19} Watson contends that the State failed to prove that he fired the shots that killed Gray and injured Wood and Bodine. In support, he argues that no one saw him shoot, and that the evidence conclusively establishes there were two guns used in the commission of the offense. Watson argues that the State failed to prove that he committed the offenses either as a principal or as an aider and abettor. Watson further argues that even if Wood did claim to observe Watson shooting, his testimony at trial was not credible.

**{¶ 20}** When a defendant challenges the sufficiency of the evidence, the defendant is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist. 2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶ 21}** Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

**{¶ 22}** During trial, both Bodine and Wood testified that Watson pulled a gun from his right pocket, and told them not to move. Wood testified that Bodine was shot first,

and then Wood was shot in the front of his left shoulder. He testified that he observed that Watson was the only person shooting. Wood then ran toward a nearby carwash. While he was running, he heard shots still being fired.

**{¶ 23}** Bodine testified that he immediately turned to run, and within two seconds heard gunshots. He testified that he glanced back to see if he was being chased, and he observed Watson chasing him, and still shooting. Bodine was shot in the back of his shoulder, and once in the arm. Bodine ran into the apartment building that he, Wood, and Gray had just left. After entering the building, he continued to hear shots.

**{¶ 24}** The evidence shows that the hat Gray had been wearing was located beside two of the casings found in the location where Watson initially began shooting. It had Gray's blood on it, indicating that Gray was shot during the initial shooting when Bodine and Wood saw only Watson wielding a gun. Gray's body was located just adjacent to 1526 Liscum Drive, which indicates that he, like Bodine, ran back across Liscum Drive when the shooting began.

**{¶ 25}** Seven bullet casings, including the two identified as B and G, were found where Watson initially began shooting. Furthermore, three shell casings found by Gray's body were identified as having been fired by the same gun as B and G. Three of those five shells were Federal brand. Federal brand ammunition was found, at the time Watson was arrested, in the bag containing Watson's belongings.

**{¶ 26}** During his police interview, Watson insisted that he had spent the day of the shooting in a residence located at 1571 Graham Place. However, the State presented the testimony of FBI Special Agent Kevin Horan, who was qualified as an expert in the field of cellular telephone record analysis. Horan testified that he conducted a study of

the cellular telephone towers in the area of the shooting, and determined that the telephone recovered from Watson's pocket during his arrest had been in the area of the shooting during the time of the shooting. Specifically, the phone had been "pinging" off a cellular telephone tower that serviced the apartment complex where the shootings occurred. The phone was determined to have been pinging off that tower at regular intervals before the shooting up until 3:13 p.m. afterwards. Horan testified that the cell phone recovered from Watson would have utilized a different tower had it been in the area of 1571 Graham Place. Watson told the police that the cellular phone in question belonged to his wife. However, the evidence showed that after the shooting, the phone made calls to Watson's wife, his girlfriend, and his mistress. Indeed, over 560 calls were made to the mistress's phone that day.

{¶ 27} The State also presented evidence that Watson's mistress lived in Apartment K of a building in the same area as the shooting. The police found that a bullet had penetrated the outer wall of Apartment L, which was next to Apartment K. At the same time as a forensic team was in Apartment L retrieving the bullet, the cellular telephone recovered from Watson's pocket on the day of his arrest received a text message from the mistress's cellular telephone stating, "[d]on't open the door."

{¶ 28} There was evidence presented that Watson left the area for a few days following the shooting At the time of his arrest, following his return, he had changed his hair by dying the tips of his dreadlocks red.

{¶ 29} Evidence was also presented that Bodine was serving a prison term on an unrelated charge at the time this case came to trial. Approximately 90 days before trial, Bodine began to receive threats that he would be hurt if he testified. About three weeks

before trial, he was approached in the prison yard and told that if he signed a blank piece of paper presented to him by other inmates, he would be safe. Bodine signed the paper. A few days later he noted that his prison identification card was missing.

{¶ 30} Bodine testified at trial on July 29, 2014. The following day, defense counsel presented to the prosecutor an affidavit that counsel had received that day from Watson. The affidavit was signed by Bodine, and had been notarized on July 15, 2014. The affidavit essentially recanted Bodine's testimony, and indicated that Watson was not the shooter. It was noted that the handwriting in the body of the affidavit was different from Bodine's signature, and that the affidavit indicated that the shooting had occurred later in the afternoon, rather than the actual morning time. Bodine and House testified that Bodine denied signing an affidavit with any text, and Bodine denied any desire to recant his trial testimony.

{¶ 31} Finally, on August 1, 2014, Bodine and Watson came into contact as they were being transported to court from the jail. Watson asked Bodine why he took the stand. Watson also addressed other inmates stating, "[o]ne of y'all beat him up and I'll give y'all four phone cards." Watson also called Bodine a "snitch," and a "bitch."

{¶ 32} Bodine and Wood both positively identified Watson as the person with the gun. Wood testified that Watson shot him and Bodine. Bodine testified that while running, he looked back and observed Watson giving chase while firing. The evidence indicates that Wood ran off to a carwash, and continued to hear shots fired. Bodine reached the apartment building he entered after the shooting, and continued to hear shooting. Gray's body was found in between the area where the shooting began and the apartment building where Bodine sought refuge. The casings around Gray's body were a

match to some of the casings found at the sight of the initial shots. Gray's bloody cap was found next to casings where the initial shots were fired. The police found Federal brand shells by Gray's body and at the site of the initial shooting. They also found Federal brand bullets with Watson's belongings seized during his arrest. The cell phone records indicate that Watson was in the vicinity of the shooting. He left town, changed his appearance, and threatened Bodine. We conclude that this evidence is sufficient to permit a reasonable jury to find, beyond reasonable doubt, that Watson was the person who shot all three victims.

{¶ 33} We next turn to Watson's claim that Wood's testimony lacks credibility. Watson contends that the fact that Wood changed his story between his statement to the police and his testimony at trial renders his testimony at trial incredible. He further argues that Wood contradicted his own testimony by initially testifying that he saw Watson shoot Bodine and then shoot him before he ran, but admitting on cross-examination that he ran away as soon as he saw the gun.

{¶ 34} As previously noted, Wood initially declined to cooperate with the police investigation, going so far as to tell the police that he did not know who shot him and signing a non-prosecution form. He later identified Watson on a photo array, but declined to sign the array or circle Watson's picture. Wood then testified at trial that Watson shot him and Bodine.

{¶ 35} During his testimony, Wood admitted that he initially informed the police that he did not know who shot him. When asked why he did so, Wood stated, "[b]ecause I didn't want to have nothing to do with it. I was scared. * * I was going to get killed or something - - something was going to happen me [sic]." Tr. 359. Detective House

testified that Wood appeared scared when he initially indicated that he did not want to pursue charges against the shooter.

**{¶ 36}** "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve." *State v. Smith*, 2d Dist. Montgomery No. 25462, 2013–Ohio–5345, ¶ 15. "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *Id.* at ¶ 16. The jury, as the trier of fact in this case, was free to believe some, all, or none of Wood's testimony. Wood was subjected to cross-examination regarding his reason for not initially cooperating with the police. We conclude that Wood's explanation of his reason for not initially identifying Watson is not inherently incredible; therefore, we conclude that the jury did not lose its way in crediting Wood's testimony.

**{¶ 37}** We next address the argument that Wood's testimony at trial was contradictory. Specifically, Watson claims that Wood initially testified that he saw Watson fire the gun, but later contradicted himself by claiming that, upon seeing the gun, he immediately turned and ran. We disagree with this characterization of the testimony. Our review of the transcript does not reveal any contradiction. Wood testified that he saw Watson draw the gun, then shoot Bodine, then shoot him, and at that point he immediately turned and ran away. This testimony is corroborated by the fact that Wood was shot in the front of his shoulder. We again find nothing inherently incredible in Wood's testimony, and conclude that the jury did not lose its way in crediting Wood's testimony.

**{¶ 38}** Based upon the record before us, we conclude that Watson's conviction is

supported by legally sufficient evidence and is not against the manifest weight of the evidence. The First Assignment of Error is overruled.

## IV. The Trial Court Did Not Abuse its Discretion in Declining to Permit Watson to Ask a Victim Witness, on Cross-Examination, about the Existence of "Bad Feelings" Between the Witness's Family and Watson's Family

{¶ 39} Watson's Second Assignment of Error is as follows:

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT RULED THAT APPELLANT'S TRIAL COUNSEL COULD NOT IMPEACH CREDIBILITY AND DEMONSTRATE MOTIVE TO LIE AT CROSS-EXAMINATION OF A GOVERNMENT WITNESS WHO IDENTIFIED APPELLANT AS THE PERPETRATOR.

{¶ 40} Watson contends that he was denied his right to effectively cross-examine Bodine at trial. Specifically, he contends that the trial court improperly denied him the right to question Bodine "related to trouble and bad feelings that [Bodine] and his family had toward [Watson's] family." He argues that he was therefore improperly denied the right to question Bodine's motivation to lie as affecting his credibility at trial.

{¶ 41} Prior to Bodine's testimony, defense counsel sought to exclude any questions by the State regarding alleged threats made against Bodine by, or at the behest of, Watson. Thereafter, during defense counsel's cross-examination of Bodine, the following colloquy took place:

Q: Mr. Watson has a big family, doesn't he?

A: Yes.

Q: Okay. You've had trouble with some of them, haven't you?

A: No.

Q: Some of your relatives have bad feelings about his relatives, don't they?

{¶ 42} At that point the prosecutor entered an objection questioning the relevancy of the question, and noting that this line of questioning would potentially open the door for the State to ask Bodine questions regarding threats made against him. The trial court found that the relevancy was "marginal," and that such questioning could open the door to the evidence that defense counsel had wanted excluded, which the trial court agreed would be unfairly prejudicial to Watson.

{¶ 43} We disagree with the State and the trial court's assessment that the evidence regarding the relationship between the two families in question was not relevant. Evid.R. 616(A) provides that "[b]ias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence." "Because the possible bias of a witness is always significant in assessing credibility, the trier of fact must be sufficiently informed of the underlying relationships, circumstances, and influences operating on the witness * * *." *State v. Williams*, 61 Ohio App.3d 594, 597, 573 N.E.2d 704 (9th Dist. 1988). Evidence that witnesses, defendants, and victims, as well as their families, may have bad relationships is potentially evidence of bias.

{¶ 44} However, we note that the trial court did not merely sustain the objection based upon a finding that the evidence was not relevant. The trial court went on to indicate that the relevance of the evidence was significantly outweighed by the possible

unfair prejudice that would result from the evidence of threats against the witness, which defense counsel had sought to be excluded.[1] We conclude that, under these circumstances, the trial court did not abuse its discretion in sustaining an objection to a line of questioning that may have resulted in unfair prejudice and confusion of the issues. Evid.R. 403(A).

{¶ 45} When Bodine was later recalled to the stand, the issue of the threats made by Watson was admitted. During this testimony, Bodine admitted that at the time of the confrontation between him and Watson that occurred while they were being transported from jail to the courtroom, Watson asked Bodine why he took the stand. Bodine testified that he responded, "[b]ecause you killed my cousin." This statement clearly indicated a potential source of bias on the part of Bodine, and the jury was clearly made aware of that bias. Because Watson was able to present this potential bias to the jury, we conclude that the trial court's previous ruling, even if it had been erroneous, would not have been so prejudicial as to merit reversal.

{¶ 46} The Second Assignment of Error is overruled.


## I.    Conclusion

{¶ 47} Both of Watson's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . .

---

[1]  At oral argument, Watson contended that trial counsel, during the discussion of the State's objection, indicated that counsel was willing to proceed with the line of questioning regardless of the danger of opening the door to questions regarding threats made. We find nothing in the record to support this claim.

FROELICH, P.J., and HALL, J., concur.


Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt
Jeffrey T. Gramza
Hon. Barbara P. Gorman