[Cite as *State v. Stephens*, 2016-Ohio-5270.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26827 |
| | : | |
| v. | : | T.C. NO. 12CR2085 |
| | : | |
| KEITH A. STEPHENS | : | (Criminal appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 5th day of August, 2016.

. . . . . . . . . .

ANN M. GRABER, Atty. Reg. No. 0091731 and ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorneys, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorneys for Plaintiff-Appellee

TINA M. McFALL, Atty. Reg. No. 0082586 and VICTOR A. HODGE, Atty. Reg. No. 0007298, Assistant Public Defenders, 117 S. Main Street, Suite 400, Dayton, Ohio 45422
      Attorneys for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Keith Stephens, filed September 3, 2015. Stephens appeals from his August 27, 2015 Judgment Entry of Conviction, following a bench trial, on one count of tampering with evidence, in violation

of R.C. 2921.12(A)(1), a felony of the third degree. Stephens was sentenced to community control sanctions for a period not to exceed five years. We hereby affirm the judgment of the trial court.

{¶ 2} Stephens was indicted on December 18, 2012, and on June 9, 2015, he entered a plea of not guilty. At trial, William Geiger testified that he is employed by the City of Dayton Police Department as a detective, with 18 years of police experience, and that he was the lead detective investigating allegations against Stephens of gross sexual imposition involving two juvenile victims, having learned of the allegations from Detective Dix. Geiger stated that he met with Stephens on January 2, 2012, at the Safety Building to discuss the nature of the investigation, and he testified that at that time he believed Stephens "understood the investigation and understood the seriousness of the situation." Geiger stated that he spoke with Stephens about the same investigation again at the Safety Building on February 20, 2012, after Dix contacted Stephens, who "came down of his own free will" for the interview.

{¶ 3} Geiger stated that Stephens "was not arrested either time," and that "[o]n both occasions, I advised him of the Miranda warning from the pre-interview form." Geiger identified as Exhibit 1 the pre-interview rights form from the February 20, 2012 interview, and he testified that he went over each right individually with Stephens, who then placed his initials next to each of the rights. Geiger stated that Stephens indicated that he understood each right and did not ask any questions. Geiger stated that he asked Stephens to read the waiver of rights portion of the form, and that Stephens did so without asking any questions and then signed the form.

{¶ 4} Geiger stated that Stephens was interviewed for five hours on February 20,

2012, and that the interview was recorded. Geiger testified that he viewed a 40-minute portion of the interview with the prosecutor, namely Exhibit 2, and he stated that it is an accurate representation of that portion of the interview. Geiger testified as follows regarding the interview:

We spoke at length. Initially he denied the accusations at all (sic). He claimed that he had never touched either child and denied it. Eventually he changed his story. He said there was, the one female victim there was an instance in which he had put some vaginal cream for some sort of irritation on the girl's stomach and instructed her to rub it in. Prior to that he denied that he ever did any sanitary [sic] as far as cleansing or creams or anything like that. The more we talked, initially he stated that he put it on approximately in the area of her stomach. He then, the more we talked the farther down it moved until he said that it was in the area of the vagina.

{¶ 5} Geiger stated that he then asked Stephens "to trace an outline of his hand and then to indicate on that * * * tracing that he made, the fingers he used to apply the cream to the child." According to Geiger, Stephens traced his hand and then initially pointed to the drawing. Geiger subsequently asked Stephens to circle the fingers he used to touch the victim, according to his testimony, and he stated that Stephens circled his index and middle finger. Geiger stated that he asked Stephens to sign and date the tracing, at which time Stephens "had a look on his face in which he appeared upset for lack of a better word." Geiger stated that Stephens hesitated and then signed and dated the tracing. Geiger testified that he then sketched a female vagina and asked Stephens

to indicate on the drawing where he applied the cream, and that Stephens did so. Geiger identified Exhibit 3 as his drawing reflecting a line drawn by Stephens.

{¶ 6} Geiger testified that he subsequently left the interview room for several minutes, leaving Stephens alone, and he testified that the video reflects that while he was outside of the room, Stephens stated "this ain't going to help me." Geiger testified that he returned to the room, spoke to Stephens, and then left the room again. Geiger stated that the video reflects that at that time, Stephens "picked up the piece of paper that he had traced of his hand, said something to the effect of shit ain't going to help me in no goddamned way and he started tearing it up." Geiger stated that the video reflects Stephens tearing the paper, and he identified as Exhibit 4 the torn pieces of the tracing. Geiger testified that Detective Linda Sipes was monitoring the interview room, and that the video reflects that as Stephens "was tearing up the pieces of paper and wadding it up, apparently to dispose of it, she came into the room and requested that he give her the piece of paper and he did so." Geiger stated that Sipes then gave the pieces to him.

{¶ 7} On cross-examination, Geiger acknowledged that he called Stephens a liar in the course of the interview and that he told him, " 'What you're saying ain't going to help you.' " When asked if he told Stephens "* * * that this explanation, what he has drawn down here on this paper, what he has told you in conjunction with that paper is crap, bullshit and a lie," Geiger responded, "I believe so." The following exchange occurred:

Q. By the time you walked out of the room, this last time we just talked about, 3:36 I think. By that time, were you satisfied that you had totally convinced him that his explanation of spreading this cream, and what

he had told you is he put the cream on the girl and told her to rub it in? (sic) But were you satisfied that you had totally convinced him that that explanation was worthless?

A. I believe I conveyed it. I don't know if I convinced him.

Q. You certainly conveyed that message.

A. I did convey that message multiple times but you'd have to ask him if he was convinced of it.

Q. That's the message you were conveying, his explanation is worthless, the paper is worthless. And you leave. And you leave him there in that condition.

A. No. His explanation was worthless. I never said anything about the paper being worthless.

* * *

Q. And after you walked out, all his attention, as far as tearing up the piece of paper, was the one he drew, right?

A. He tore up the paper that he drew, correct.

Q. Right. And not the one you drew.

A. That's correct.

Q. He didn't bother any of your stuff?

A. That's correct.

Q. So if he believed what you told him, what he tore up was something that was worthless to you.

A. I have no idea what he would think.

\* \* \*

Q. I didn't ask you what he thought. I just said if he believed what you told him, your message was this paper is worthless, your explanation is worthless; isn't that true?

A. My message was his message (sic) is worthless. I never said anything about the paper.

**{¶ 8}** At the conclusion of the trial, the court indicated that it intended to review the video "which I understand is a portion of the entire video which is about 40 minutes long but it's been stipulated to that this is a true and accurate portion and it's the only portion that's relevant to this trial \* \* \*." In a "Decision and Entry Finding the Defendant Guilty," the court indicated in part as follows:

\* \* \*

Upon review of the video containing a forty-minute portion of the entire interview conducted in the present case, as well as the testimony and exhibits presented during trial, the Court finds that the Defendant, with knowledge of an ongoing investigation, altered potential evidence with the purpose of impairing its availability or value, in violation of § 2921.12(A)(1). In reaching this conclusion, the Court notes that the Defendant had knowledge of an official investigation in progress since Detective Geiger discussed with the Defendant on two separate occasions the nature of the investigation, which involved gross sexual imposition involving two juvenile victims. On both occasions, the Defendant was informed that he was a suspect. Moreover, the Defendant was advised of his rights and Detective

Geiger went over a pre-interview rights form with the Defendant. The Defendant did not raise any questions concerning his rights and he indicated that he understood his rights by initialing next to each right listed on the form and signing his name at the bottom of the form. The Court finds that this constitutes knowledge of an official investigation in progress.

The Court further notes that although the Defendant did not completely destroy the sheet of paper containing his traced hand, the Defendant did substantially alter the paper by tearing the sheet of paper multiple times, resulting in numerous pieces of ripped and wrinkled shreds of paper. In regards to the Defendant's purpose, the Court finds that the Defendant acted with the purpose of impairing the potential availability of the paper containing his traced hand. The Court notes that the Defendant commented two times on the damaging nature of the paper. When Detective Geiger first left the interview room, the Defendant looked sorely (sic) at the paper and commented, "This shit ain't gonna help me." The Defendant made his second comment right before shredding the paper. He stated, "This shit ain't gonna do me no god damn good." Thereafter, the Defendant ripped the paper in several pieces. Additionally, upon being requested to hand over the ripped pieces to a law enforcement official, the Defendant was reluctant, keeping some of the pieces in another hand until the law enforcement official asked him to turn over the rest of the pieces. This reluctance to hand over the paper further leads the Court to conclude that the Defendant's purpose in tearing the paper was to impair its

availability or value in the ongoing investigation.

As a result, the Court finds that the State has sufficiently proven each and every element of R.C. § 2921.12(A)(1) beyond a reasonable doubt.

{¶ 9} Stephens asserts two assignments of error herein which we will consider together. They are as follows:

THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY OF TAMPERING WITH EVIDENCE AS THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AS A MATTER OF LAW.

And,

THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY OF TAMPERING WITH EVIDENCE AS THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 10} According to Stephens, "the State failed to produce sufficient evidence that [he] altered the paper tracing of his own hand with the purpose to impair its value or availability as evidence" in the investigation, and his conviction is against the manifest weight of the evidence. Stephens asserts that his comments made while alone in the interview room "were made under circumstances that would lead any reasonable trier of fact to conclude that Mr. Stephens['] statements * * * were related to his belief that the paper tracing of his hand had no value as evidence, and his distraught emotional and physical state at the time he tore the paper up."

{¶ 11} Stephens asserts as follows:

The video recording shows Detective Geiger repeatedly told Mr.

Stephens that his explanation, what he has drawn down here on this paper, what he has told him in conjunction with the paper is crap, bullshit, and a lie.

At 3:31 on the video/audio recording, Mr. Stephens tells Detective Geiger, "I gave you that." (Mr. Stephens said while pointing at the paper tracing with his hand) Detective Geiger's response is "Keith that is a little bit, that is something you tell somebody to try to get out of trouble. That is enough to try to get you out of trouble and that is all it is." Mr. Stephens gestures to the paper and says, "I told you that's what it was. I am telling you right now, that is it." At 3:32 Detective Geiger responded, "Keith that ain't the truth . . . that ain't all of it. I know it ain't the truth, and I know it ain't all of it. Now once again we can cling to this. We can pray to God that you will find somebody to believe it, but I am going to tell you right now, no one's going to."

At 3:34 on the video/audio recording, Detective Geiger says, "There is more to this story." Mr. Stephens, while touching the paper responded "Sir, that's it. That is the only thing. That is all I got." Detective Geiger says, "You got more. I know you got more. You might have put cream on that girl." Then Mr. Stephens says while touching and patting the paper, "That is all that I have right there. I was scared about that."

At 3:35 on the video/audio recording, Mr. Stephens says, "Man you are going to do what you are going to do. It doesn't make any difference. I am going to take myself out, throw myself over a balcony, anything cuz I

am not going to do time."  Detective Geiger says in response, "Are you feeling like hurting yourself, right now?"  Mr. Stephens is clearly distraught crying and threatening to hurt himself.  After some additional discussion about the need to take Mr. Stephens to the hospital due to his threats to hurt himself, at 3:37 Detective Geiger leaves the room.

Immediately after Detective Geiger leaves the room, Mr. Stephens makes additional comments at 3:37.  Mr. Stephens says, "I can't live like that [. . .] I told you what the deal was.  [Mr. Stephens touches the paper] You still doing this shit.  [crying]  That is the only deal.  How come she don't tell them that?"  It is at this point that Mr. Stephens appears to tear paper off of a pad and tears it up.    As he is in the process of tearing the paper up Mr. Stephens says, "This shit ain't going to do me no God damn good."

Detective Sipes comes into the room and says, "Excuse me . . . can I have that paper please?   The rest of it."   Mr. Stephens says, "Yeah, have the paper."   Immediately after handing the paper over Mr. Stephens says, "I just tore it up . . . mad."   Mr. Stephens appears to be so emotionally and physically distraught that Detective Sipes asks, "Are you all right?"

There was no reluctance to turn over the pieces of paper on the video.   * * * When Detective Sipes asked for the paper, she points to Mr. Stephens' left hand. * * * He immediately gave her the pieces of paper in his left hand. * * * Then she asked for the rest of it as she reached for his right hand. * * * Mr. Stephens never attempted to keep the paper away from

her or resisted in anyway. (sic)

{¶ 12}   Regarding the first assignment of error, the State responds that "Stephens knew police were investigating allegations of sexual misconduct and he knew he'd made damaging admissions.   He also knew that the signed drawing tied him to the crimes the police were investigating, and it provided additional evidence of culpability.   Knowing that, he attempted to destroy it."   The State further asserts in response to the second assigned error that despite defense counsel's "attempts at trial to show that Stephens was not aware that the drawing was of any value to the investigation and that he believed the tracing was 'worthless' and 'lies' as a result of Detective Geiger's comments, the trial court accepted Geiger's testimony, which was credible and consistent with the other evidence."

{¶ 13} As this Court has previously noted:

When a defendant challenges the sufficiency of the evidence, the defendant is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*,

61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

*State v. Watson*, 2015-Ohio-4517, 46 N.E.3d 1090, ¶ 20-21 (2d Dist.)

{¶ 14} R.C. 2921.12 provides: "(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following: (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." R.C. 2901.22(B) provides:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When

knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶ 15} As the trial court noted, Geiger testified that he twice advised Stephens of the nature of the investigation, and that Stephens understood the purpose of the interviews. We note that Stephens' February 20, 2012 pre-interview form provides in part, "You are being interviewed in regards to the crime of gross sexual imposition/rape." We have further reviewed the video of Stephens' interview, and we conclude that the trial court's characterization thereof is accurate. We note however that the video does not portray hesitation on Stephens' part in handing the pieces of paper to Sipes or suggest that Stephens attempted to withhold the pieces from her. Throughout the interview, Geiger repeatedly questioned Stephens about the alleged gross sexual imposition and expressed doubt regarding Stephens' version of events. Stephens traced his left hand and after being asked to circle all of the fingers with which he touched the victim, Stephens complied. He then signed his name and dated the tracing. When alone in the room the first time for several minutes, Stevens appears restless at times and distraught. Upon Geiger's return to the room, Stephens expressed fear about going to prison. Geiger subsequently informed Stephens that if his heart were set on sending him to prison, Geiger had "everything I need." When Geiger left the room for the second time, Stephens looked at the tracing, tore it from the pad and then tore it into five pieces. Regarding Stephens' argument that he believed the tracing to be of no value or worthless, we note that in the course of defense counsel's cross-examination of Stephens, Geiger

made clear that while he doubted Stephens' version of events, he never indicated to Stephens that the tracing itself was without value. Stephens' own comments about the nature of the tracing being of no help to him as well as his expression of fear about going to prison create a reasonable inference that he was aware that the tracing and his markings thereon were not entirely exculpatory. Although we may very well have drawn a different conclusion, a reasonable fact-finder could infer that the act of tearing up the drawing was in aid of, and for the purpose of, impairing its value.

{¶ 16} We conclude, viewing the evidence in a light most favorable to the State, that sufficient evidence was presented at trial to convince the average mind that Stephens, knowing that an official investigation was in progress, altered the paper containing the tracing of his hand and his markings thereon by tearing it into pieces with the purpose to impair its value or availability as evidence in the investigation against him. Having reviewed the entire record, we further cannot conclude that the trial court lost its way and created such a manifest injustice that Stephens' conviction must be reversed. Since Stephens' conviction is supported by sufficient evidence and is not against the manifest weight of the evidence, his two assigned errors are overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.


Copies mailed to:

Ann M. Graber
Andrew T. French
Tina M. McFall
Victor A. Hodge

Hon. Dennis J. Adkins