[Cite as *State v. Holley*, 2017-Ohio-7430.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27115 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-3905 |
| | : | |
| SEAN A. HOLLEY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 1st day of September, 2017.

. . . . . . . . . .

MATHIAS H. HECK, JR., by LYNNE R. NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

BYRON K. SHAW, Atty. Reg. No. 0073124, 4800 Belmont Place, Huber Heights, Ohio 45424
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, Defendant-Appellant, Sean Holley, appeals from his convictions for Felonious Assault and Domestic Violence. In support of his appeal, Holley contends that trial counsel rendered ineffective assistance of counsel by admitting that Holley was guilty of Domestic Violence; by discussing the details of jury deliberation during voir dire; by failing to poll the jury following its verdicts; by failing to give a closing argument at the suppression hearing; and by failing to object when the prosecution mentioned legal definitions during trial. In addition, Holley contends that his conviction for Felonious Assault is against the manifest weight of the evidence because the victim did not sustain serious physical harm.

{¶ 2} After reviewing the record, we conclude that trial counsel did not render ineffective assistance of counsel, and that Holley's convictions are not against the manifest weight of the evidence. Counsel's actions either fell within the realm of trial tactics or did not fall below any objective standard of reasonable representation. The record also contains overwhelming evidence that the victim was rendered temporarily unconscious during the assault. This constitutes a temporary substantial incapacity, and, therefore, serious physical harm for purposes of R.C. 2903.11(A)(1). Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} In late December 2015, Holley was indicted on charges of Felonious Assault, Domestic Violence (one prior conviction), Theft, and Aggravated Burglary. These charges arose from an incident that occurred on December 17, 2015, at an apartment on

Bronson Avenue in Jefferson Township, Ohio.

{¶ 4} The victim of the alleged crimes was M.C., who had been in a relationship with Holley for seven years. M.C. was also the mother of Holley's son, L.H.

{¶ 5} M.C. and Holley met in 2008, and lived together for about seven years at multiple addresses. At the time of the incident in question, L.H. was three years old, and M.C. and Holley had lived at the Bronson Avenue address since November 2013. During the course of their relationship, they had broken up and reconciled numerous times, and Holley had previously pled guilty in 2009 to a domestic violence charge filed in Dayton Municipal Court. M.C. was the victim in that case.

{¶ 6} In early December 2015, M.C. left the apartment, taking L.H., and went to live with her grandmother, who was ill. There was some dispute at trial over the circumstances of her departure, whether Holley was supposed to be living at the apartment, and the reason why M.C. returned to the apartment on December 15, 2015. However, these factual differences are basically irrelevant because the jury acquitted Holley of the Theft and Aggravated Burglary charges. What is not disputed is that when M.C. returned to the apartment on December 17, 2015, she did not expect Holley to be there.

{¶ 7} When M.C. entered the apartment, Holley was sitting on the couch. He got up and hugged her. M.C. and Holley disputed what occurred after that. According to M.C., Holley asked if she wanted to get back together, and she laughed it off. They then began to argue over a phone Holley had given her. M.C. testified that when she refused to give Holley the phone, Holley hit her in the face, then grabbed her, threw her on the couch, and choked her until she passed out. When M.C. woke up, Holley's back was to

her, and he was trying to access her phone. M.C. then ran out of the apartment, where she saw a maintenance man and began screaming for help.

{¶ 8} According to Holley, he and M.C. talked for a bit and then he asked her about a cell phone video he had received a few weeks before from a mutual friend. The video involved M.C. and another man. The conversation became heated, and Holley asked for the phone back, as he did not think he should pay the phone bill while M.C. was out having sexual encounters with other men. They struggled over the phone, and Holley admitted pushing M.C. down hard on the couch while attempting to get the phone away. He finally got the phone and was trying to unlock it when he noticed that M.C. had run out of the apartment. He ran after her because he was angry and emotional and wanted to resolve the issue.

{¶ 9} Again, the stories diverge once M.C. left the apartment. There were witnesses, however. Gary R., a maintenance man for the apartment complex, saw a woman running out of her apartment, hollering for help. A young man (later identified as Holley) came behind her and they eventually went down on the ground. Gary observed Holley beating the woman badly, and called 911. While he was on the phone with the dispatcher, Holley was using his fists, beating the woman, and then began choking her. Gary told the dispatcher they might need to send a medic because he thought the woman was badly hurt. She had stopped moving.

{¶ 10} A neighbor, Charlene P., testified that she heard someone screaming for help and looked out her bedroom window. She saw her next-door neighbors fighting and dialed 911. Charlene called 911 because she feared for the woman's life. The man (later identified as Holley), was sitting on top of the woman, banging her head on the

ground, and then he started punching her. At first the woman was fighting back, but after a few minutes, she went limp and was not moving anymore. Charlene told the 911 operator the woman was not breathing; she actually thought the woman was dead. Charlene then saw a slight movement of the woman's arm and saw Holley begin to choke her again. At that point, Charlene heard sirens, and Holley got off the woman and ran into the apartment.

{¶ 11} Another resident of the complex, Allen B., was working on his car and heard a woman screaming, "Somebody help me, he's trying to kill me." Transcript of Proceedings, Vol. I., p. 218. At first Allen thought kids were playing. However, he then saw the man (again, later identified as Holley) pushing the woman to the ground. As Allen got closer, he saw Holley banging the woman's head against the ground and punching her. Allen began asking Holley to get off the woman, and pulled Holley off for a brief moment, but Holley jumped back on the woman. At that point, Holley had his hands on the woman's neck, choking her. The woman was trying to get Holley's hands off and was kicking. At that point, the woman started foaming at the mouth and her eyes got ready to roll to the back of her head. She appeared to lose consciousness. The woman's arm dropped, and Allen pushed Holley off the woman.

{¶ 12} Allen testified that he began walking the woman back to some other women who were outside. By that time, Holley had run inside the house. A few minutes later, Allen ran towards the back of the apartment and saw Holley running up the street toward a gas station. Allen indicated that the woman had blood in her mouth and it got on his shirt.

{¶ 13} Brandy S. was also a neighbor. She heard a noise and came out of her

apartment, where she then heard someone screaming. When she got closer, she saw the woman on her back and a man (later identified as Holley) choking the woman, and saying "It's life or death; this is my life." Transcript of Proceedings, Vol. I, p. 235. Brandy began screaming at the man and at Allen, trying to get Allen to intervene. Holley had both hands around the woman's neck. The woman was not able to respond; her eyes were rolling back in her head and she was foaming at the mouth. While this was happening, Brandy was yelling at Allen to get Holley off, as he was going to kill the woman.

{¶ 14} The woman was "gone" for a minute, and then Holley jumped back on her neck, trying to choke her. When Allen pulled at the man's arm, Brandy told the woman to run to Brandy's house. She was able to get the woman safely to her (Brandy's) home. Brandy described the woman as terrified. Even after the police arrived, the woman did not want to go to the hospital because she was afraid Holley would come to look for her.

{¶ 15} According to M.C., after she ran outside, she asked the maintenance man for help and he backed away. Holley then grabbed her by her hair and ripped her hairpiece off her head. Holley threw her down on the ground and began choking her again. M.C. thought she heard Holley saying, "If I can't have you, nobody else can; I'm going to kill this 'B.' " Transcript of Proceedings, Vol. I, p. 138. M.C. passed out again, and when she came to, a man was standing by Holley's shoulder, telling him to get off her. She passed out once more, and when she came to, Holley was choking her so hard that her teeth were "clenched" into her tongue. She also said Holley banged her head on the concrete three times.

{¶ 16} After M.C. got to Brandy's home, she was coughing and her head, tongue,

and neck were pounding. However, she refused to go to the hospital because she was afraid Holley would meet her at the hospital. Instead, she waited for her father to pick her up. The police took pictures of her neck and she made a report.

{¶ 17} Holley testified that when he caught up to M.C. outside, he grabbed her around the waist area, like a bear hug. He was trying to drag her back into the apartment, pulling her. However, M.C. put her body weight down so she dropped to the ground, and he fell with her. Holley then tried to get her up and they were arguing. M.C. was calling him vulgar names and he got on top of her, straddling her. He put his hands on her chest and put force down onto her chest. Holley said he was still angry but did not want to strike M.C. He denied punching M.C. multiple times or choking her. He admitted that Allen had persuaded him to briefly get off M.C., but when M.C. began calling him names, he went back and did the same thing, using force to push M.C. on the chest area and shoulder, into the ground. According to Holley, he finally realized it "wasn't worth it," so he got up and walked into the apartment. Transcript of Proceedings, Vol. II, p. 300.

{¶ 18} Holley denied running away, and said he walked to the bus stop. He admitted that he knew what he had done, and that he had done something wrong that day. *Id.* at p. 324.

{¶ 19} Scott Morgan, a detective with the Montgomery County Sheriff's Office, met with M.C. on December 18, 2015, and took photos of her injuries. M.C. had bruises on her chest and neck area, along with a cut mark on her tongue. On December 21, 2015, Morgan telephoned Holley and left a message. Holley called Morgan back a few hours later. During their conversation, Morgan told Holley that he had warrants for his arrest and that Holley needed to turn himself in. Holley said he wanted to see his son and

would turn himself in when he was ready. Holley was arrested at the Bronson Avenue apartment later that day.

{¶ 20} As was noted, an indictment was filed on December 30, 2015, charging Holley with Felonious Assault, Domestic Violence, Theft, and Aggravated Burglary. During the proceedings, Holley filed a motion to suppress, which was denied. Following a jury trial, Holley was acquitted of Theft and Aggravated Burglary and was convicted of the remaining charges. The trial court sentenced Holley to eight years in prison on the Felonious Assault charge and to 18 months in prison for Domestic Violence, with the terms to run concurrently. Holley now appeals from the judgment of the trial court.

II. Ineffective Assistance of Counsel

{¶ 21} Holley's First Assignment of Error states that:

Appellant's Conviction and Sentencing Should Be Overturned Due

to an Ineffective Assistance of Counsel.

{¶ 22} As noted, Holley asserts that trial counsel rendered ineffective assistance in several ways. After setting forth the general standards for such claims, we will consider each issue separately.

{¶ 23} We review ineffective assistance of trial counsel claims under the analysis established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Based on these cases, trial attorneys are entitled to a strong presumption that their conduct falls within a wide range of reasonable assistance. *Strickland* at 688. "Counsel's performance will not be deemed ineffective unless and

until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." (Citations omitted.) *Bradley* at 137, paragraph two of the syllabus. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

## A. Admission of Guilt

{¶ 24} Holley's first argument is that trial counsel was ineffective by admitting during closing argument that Holley was guilty of Domestic Violence. According to Holley, this admission negatively influenced the jury into thinking he was guilty of the other charges as well. However, we disagree.

{¶ 25} Holley was charged with having violated R.C. 2919.25(A), which provides that "No person shall knowingly cause or attempt to cause physical harm to a family or household member." During his own testimony, Holley admitted that he had held M.C. down and had pressed against her chest with force, both on the couch and outside the apartment. Holley also stated that he knew he had done something wrong. Holley's own testimony indicates, at a minimum, that he attempted to cause physical harm to a family or household member.

{¶ 26} The charge of Domestic Violence, which was elevated to a fourth-degree felony because of a prior undisputed conviction for Domestic Violence, was a far less severe crime than Aggravated Burglary, which was a first-degree felony under R.C. 2911.11(A)(1), and was only slightly more severe than the fifth-degree felony of Theft.

Faced with a strong battery of State witnesses, defense counsel likely hoped, as the State suggests, that he could build credibility with the jury by admitting what was obviously undisputed.

{¶ 27} We have stressed that "trial counsel's choice of tactics must be given deference." (Citation omitted.) *State v. Sweeney*, 131 Ohio App.3d 765, 773, 723 N.E.2d 655 (2d Dist.1999). Counsel's tactic was apparently successful, as Holley was acquitted of two of the four charges against him, including the most serious charge, which was a first-degree felony.

### B. Discussing Details of Jury Deliberation During Voir Dire

{¶ 28} Holley's second claim of ineffective assistance focuses on the fact that defense counsel discussed jury deliberations during voir dire. Holley does not say how this was harmful, and we see no possible harm. In the first place, Holley's argument misstates what actually occurred. During voir dire, defense counsel discussed the fact that the prospective jurors had already taken an oath and would take another oath requiring them to listen to everything that had already been talked about (presumably the subjects mentioned in voir dire). Transcript of Proceedings, Vol. I, p. 107. At that point, defense counsel said:

> You'll listen to the evidence, you'll listen to the rules that the judge gives you, you'll follow her instructions and then you'll require the State to prove to you with evidence beyond a reasonable doubt each and every element of the offenses that Sean is charged with. Okay?
>
> So all right, so you do all that. And you're back there in the jury

room with the other jurors.

*Id.* Immediately thereafter, the court asked counsel to approach. The following exchange then occurred:

THE COURT: Apologize for interrupting.

MR. BARBATO: That's okay.

THE COURT: But you can't talk about jury deliberations and what they're going to do in the back room.

MR. BARBATO: Where I was going with it, I was just going to ask, my point is I was going to ask if he felt like he was doing something wrong if he came back with "not guilty."

THE COURT: That you can do but you cannot –

MR. BARBATO: Yeah.

THE COURT: – talk about when they get back there –

MR. BARBATO: I'm done.

THE COURT: That happened once and it's never going to happen again in this courtroom. Okay?

MR. BARBATO: Okay.

THE COURT: That's fine.

*Id.* at p. 108.

{¶ 29} Based on the actual content of the inquiry, as well as the discussion that occurred during the sidebar conference, it is apparent that defense counsel did not improperly discuss jury deliberations, nor did counsel intend to discuss jury deliberations.

{¶ 30} After the sidebar conference, defense counsel commented that after the

jurors arrived in the jury room, a juror might feel that he or she was not convinced or did not think the state had met its burden of proof. Defense counsel then asked the prospective jurors how they would feel about that. *Id.* at p. 109. There was no audible response. *Id.* At that point, defense counsel noted that the State had asked if jurors could find someone guilty if the State met its burden.

{¶ 31} Building on this point, defense counsel next asked a particular juror if he understood that he could also fulfill his oath by finding the defendant not guilty as well as guilty. The juror responded that he could. *Id.* Finally, defense counsel asked the jurors if they would feel they had failed if they did not come back with a guilty verdict. In response, the jurors said "no," in unison. *Id.*

{¶ 32} These remarks were not improper, and we see no way in which this could have prejudiced Holley. Defense counsel was merely following the same line of inquiry that the State had employed while conducting its own examination of the jurors.

C.   Failure to Poll the Jury

{¶ 33} Holley's third allegation of ineffective assistance is based on defense counsel's failure to poll the jury after the verdicts were announced. Specifically, Holley contends that one or more jurors could have been undecided or confused about the verdict. However, Holley contends that he would never know if this were true or not, because defense counsel improperly failed to poll the jurors.

{¶ 34} As an initial matter, we note that the trial court did poll the jury on the Domestic Violence issue, to clarify a question about the way the jury had filled out the verdict form for the prior Domestic Violence conviction, which was a necessary element

for a finding that Holley should be convicted of a higher level of Domestic Violence.

{¶ 35} The original verdict form stated that:

We, the jury, find the defendant, SEAN A. HOLLEY, (*) _____ previously convicted of Domestic Violence on February 17, 2010, in the case of State of Ohio v. Sean Holley, being Case No. 09CRB13830, in the Dayton Municipal Court.

(*) Insert in ink "WAS" or "WAS NOT".

Doc. #48, p. 2. *See also* Transcript of Proceedings, Vol. II, pp. 374 and 385-386.

{¶ 36} Instead of inserting the word "was," the jury had inserted the word "guilty" in the blank space. Doc. #48, p. 2. Upon being polled, each juror affirmed his or her verdict. Transcript at pp. 386-387.

{¶ 37} Although the poll pertained only to the Domestic Violence conviction and not the Felonious Assault conviction, we see no evidence in the record indicating or even suggesting that further polling the jury would have altered the outcome of the trial. *Compare State v. Engle*, 2d Dist. Montgomery No. 22934, 2009-Ohio-4787, ¶ 44-45 (noting in a case where a tainted juror had been removed, that failure to poll the jury could have been a choice of trial tactics). As we stressed, Holley was acquitted of two other serious charges.

{¶ 38} Furthermore, there is no indication the jury was confused. The only question the jury asked during deliberations concerned revocation of a privilege to be on the premises. This related to the Aggravated Burglary charge, which required a finding of trespass. *See, e.g.*, *State v. Perry*, 2d Dist. Montgomery No. 26421, 2015-Ohio-2181, which held that "one who enters a home with permission becomes a trespasser, subject

to conviction for aggravated burglary, if he assaults the victim after gaining entry." *Id.* at ¶ 29, citing *State v. Steffen*, 31 Ohio St.3d 111, 114-115, 509 N.E.2d 383 (1987). Holley was acquitted of the Aggravated Burglary charge, however.

### D. Failure to Make a Closing Argument at the Suppression Hearing

**{¶ 39}** Holley's next argument about ineffective assistance is based on defense counsel's failure to make a closing argument at the suppression hearing. Prior to trial, Holley moved to suppress statements made to the police. Detective Morgan testified at the suppression hearing about a telephone conversation he had with Holley (when Holley was not in custody), and about *Miranda* warnings given to Holley when Holley was interviewed after his arrest. At the end of the hearing, the State made a very brief statement, and defense counsel indicated that he did not wish to make a statement. Transcript of Proceedings, Vol. I, pp. 21-22. After a brief recess, the trial court overruled the motion to suppress.

**{¶ 40}** Our review of the record reveals a very clear case of appropriate administration of *Miranda* rights and interrogation, with all warnings having been given, and no indication, under the totality of the circumstances, that Holley's statement to police was involuntary. *See, e.g., State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 14-18 (2d Dist.).

**{¶ 41}** More importantly, however, Detective Morgan testified at trial and did not even discuss facts brought out during Holley's interrogation. Morgan did briefly relate the content of the telephone conversation, during which he informed Holley that he had warrants for Holley's arrest, and asked Holley to turn himself in. Holley responded that

he wanted to see his son, wanted to think things out, and would turn himself in when he was ready. Transcript of Proceedings, Vol. II, p. 265.

{¶ 42} "The right to *Miranda* warnings is grounded in the Fifth Amendment's prohibition against compelled self-incrimination." *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 16 (2d Dist.), citing *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). However, police need not "administer *Miranda* warnings to every individual they question." *Id.*, citing *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997). Instead, "*Miranda* warnings are required only when there is a custodial interrogation." *State v. Wenzler*, 2d Dist. Greene No. 2003-CA-16, 2004-Ohio-1811, ¶ 15, citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "An individual is in custody when there has been a formal arrest or a restraint of freedom of movement such that a reasonable man would believe that he is under arrest." *Id.*, citing *Biros* at 440.

{¶ 43} Because Holley was not in custody during his telephone conversation with Detective Morgan, there was no possible ground for objection at the suppression hearing, and Morgan's statements were also properly admitted at trial. As a result, we see no evidence that trial counsel's conduct fell below any objective standard of reasonable representation. *Bradley*, 42 Ohio St.3d at 137, 538 N.E.2d 373, paragraph two of the syllabus.

### E. Failure to Object to Legal Definitions

{¶ 44} Holley's final ground of ineffective assistance is based on trial counsel's failure to object to legal definitions that the State mentioned during trial. During voir dire,

the State clarified a few legal terms, like the distinction between Robbery and Burglary, and whether permission to be on premises could be revoked. Transcript of Proceedings, Vol. I, pp. 79-81. Defense counsel did not object. When the State asked if any juror could define the term "beyond a reasonable doubt," defense counsel did object. However, since none of the jurors had responded, the trial court instructed the prosecutor to define reasonable doubt herself. *Id.* at p. 82. The prosecutor did so, and then used an example to illustrate the point. *Id.* at p. 83.

**{¶ 45}** We have said that " 'we look with disfavor on attorneys' or judges' uses of examples to illustrate their own subjective conception of reasonable doubt.' " *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 50, quoting *State v. Turic*, 2d Dist. Greene No. 2010-CA-35, 2011-Ohio-3869, ¶ 13. In *Renner*, we observed that the Ohio Revised Code correctly defines the term in R.C. 2901.05(E), and that "[f]urther attempts to 'clarify' the term by example, analogy, metaphor, or simile are ill-advised." *Id.*, citing *Turic* at ¶ 13. Nonetheless, we found no error because the prosecutor's comments during voir dire did not "unfairly mislead the jury" concerning the burden of proof. *Id.* at ¶ 51. The same is true here concerning the State's example about reasonable doubt (using an analogy of believing beyond a reasonable doubt that snow had occurred when snow was not present at night, but was present on the ground in the morning, when an individual awoke).

**{¶ 46}** More importantly, the prosecutor's prior comments about the distinction between Burglary and Robbery were accurate. Specifically, the prosecutor said that while someone could be robbed in his or her own home, someone breaking into a home, "trespassing into a residence, is actually a burglary." Transcript of Proceedings, Vol. I,

p. 79. Holley was charged with Aggravated Burglary pursuant to R.C. 2911.11(A)(1), which requires a "[t]respass in an occupied structure * * * ." In contrast, no trespass is required for convictions of Aggravated Robbery or Robbery. *See* R.C. 2911.01 and R.C. 2911.02.

{¶ 47} The prosecutor also correctly stated that permission could be revoked, causing a trespass to take place. Vol. I at pp. 80-81. *See Perry*, 2d Dist. Montgomery No. 26421, 2015-Ohio-2181, at ¶ 29 (commenting that "one who enters a home with permission becomes a trespasser, subject to conviction for aggravated burglary, if he assaults the victim after gaining entry"). (Citation omitted.)

{¶ 48} Based on the preceding discussion, we find no ineffective assistance of counsel in the failure to object during voir dire, as the prosecutor's statements were accurate and there was no reason to object. Counsel did object to the prosecutor's attempt to have the jury define reasonable doubt, and this objection was sustained. The prosecution, thereafter, instructed the jury on reasonable doubt, and used an example that did not "unfairly mislead the jury." *Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, at ¶ 50. Furthermore, even if this had been otherwise, there is no indication that any failure to object to the discussion during voir dire of Robbery, Burglary, and trespass caused prejudice, since the jury acquitted Holley of Aggravated Burglary.

{¶ 49} Accordingly, since trial counsel did not render ineffective assistance, the First Assignment of Error is overruled.


### III. Manifest Weight Challenge

{¶ 50} Holley's Second Assignment of Error states that:

Appellant's Conviction and Sentencing for Felonious Assault Is Against the Manifest Weight of the Evidence as Clearly Showing No Serious Physical Harm Was Done to the Alleged Victim.

{¶ 51} Under this assignment of error, Holley contends that his conviction for Felonious Assault was against the manifest weight of the evidence because he did not cause M.C. serious harm.   In this regard, Holley relies on his own testimony that he never choked, punched, or slapped M.C. while they were on the couch inside the apartment or when they were outside.   Holley also points to the fact that M.C. did not go to the hospital, and that she was able to talk to the police without a problem immediately after the accident, which would have been difficult if she actually had been choked as she claimed.

{¶ 52} "When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "   *State v. Watson*, 2015-Ohio-4517, 46 N.E.3d 1090, ¶ 21 (2d Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).   "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' "   *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 53} After reviewing the record, we find no evidence that this case meets the standards for reversing a conviction.   Holley was charged with having violated R.C. 2903.11(A)(1), which provides that "(A) No person shall knowingly do either of the

following: (1) Cause serious physical harm to another or to another's unborn * * *."

**{¶ 54}** R.C. 2901.01(A)(5) contains several definitions of "serious physical harm," including "[a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity * * *."  R.C. 2901.01(A)(5)(c).[1]  We have held that "[t]emporary unconsciousness constitutes a temporary substantial incapacity, and therefore serious physical harm." (Citations omitted.)  *State v. Booker*, 2d Dist. Montgomery No. 22990, 2009-Ohio-1039, ¶ 16.

**{¶ 55}** While Holley denied that M.C. blacked out or lost consciousness during the struggle, there is overwhelming evidence otherwise, from several witnesses.  M.C. stated that she passed out when Holley choked her inside the apartment, and again when he choked her outside.  Transcript of Proceedings, Vol. I, pp. 136 and 138.  Other witnesses, who were not acquainted with the parties or who barely knew either party, testified that M.C. was unconscious for some period of time while she was being beaten outside.  Gary R., the maintenance man, told the dispatcher a medic might be needed because M.C. was badly hurt.  She had stopped moving at that point.  *Id.* at p. 190.  Another neighbor testified that M.C. was fighting back at first, and then went limp and was not moving any longer.  *Id.* at pp. 207-208.  In addition, the neighbor said she feared for M.C.'s life because of the way Holley was beating her.  *Id.* at p. 107.  This neighbor also told the 911 operator that M.C. was not breathing; she testified that she actually thought M.C. was dead.  *Id.* at 208.

**{¶ 56}** Allen B., who attempted to intervene and was located very close to Holley

---

[1] R.C. 2901.01 was amended, effective April 6, 2017, but no changes were made to R.C. 2901.01(A)(5).  Any changes would be irrelevant, anyway, since the court would have applied the statute in effect at the time of the crime.  *See, e.g.*, R.C. 1.58(A).

and M.C. during the fight, stated that M.C. was trying to get Holley's hands off while he was choking her. However, M.C. then started foaming at the mouth, her eyes began to roll to the back of her head, and her arm dropped for a minute. *Id.* at p. 220. Allen also stated that M.C. appeared to have lost consciousness. *Id.* at pp. 222-223.

**{¶ 57}** A fifth witness, who lived in the apartment complex, and was about eight to 12 feet from the fight, stated that M.C. lost consciousness. *Id.* at p. 236. This witness (Brandy S.) further testified that M.C. appeared to be unconscious because M.C. "wasn't responsive. She was like eyes rolling in the back of her head, foaming at the mouth. She wasn't able to move. She was like gone for a minute." *Id.* In addition, Brandy stated that she was yelling and screaming during the fight for Allen to intervene, because Holley was going to kill M.C. *Id.* at 237-238.

**{¶ 58}** "A manifest-weight-of-the-evidence argument questions the believability of the evidence and asks a reviewing court to determine which of the competing inferences is more believable." *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 40 (2d Dist.), citing *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964 (2d Dist.). " 'However, the appellate court may not substitute its judgment for that of the trier-of-fact on the issue of the credibility of the witnesses unless it is patently apparent that the factfinder lost its way.' " *Id.*, quoting *Woullard* at ¶ 81. (Other citation omitted.) There is no indication in the case before us that the factfinder lost its way. To the contrary, the evidence supporting the finding of serious physical harm due to temporary unconsciousness is overwhelming.

**{¶ 59}** As an additional matter, M.C.'s failure to go to the hospital does not foreclose a finding of serious harm. We noted in *Booker* that a victim's "failure to seek

immediate medical treatment does not preclude a finding of serious physical harm." (Citation omitted.) *Booker*, 2d Dist. Montgomery No. 22990, 2009-Ohio-1039, at ¶ 51.

**{¶ 60}** In this regard, M.C. testified that she did not go to the hospital when the ambulance came, because she was terrified that Holley would come to the hospital. Transcript of Proceedings, Vol. I, p. 141. After the incident, M.C. took shelter in Brandy S. apartment until M.C.'s father came to pick her up. Brandy was not previously acquainted with M.C., and described M.C. as terrified and traumatized. *Id.* at pp. 237 and 239-240. Brandy also said that M.C. did not want to go to the hospital because she was afraid Holley would come looking for her. *Id.* at p. 240.

**{¶ 61}** Moreover, M.C. described bruises, a cut in her mouth, and pain in her neck and head after the incident. M.C. additionally said she could not swallow or eat for a week. M.C.'s description of her injuries is supported by witnesses, who described seeing swelling of M.C.'s neck, blood in M.C.'s mouth, bruises on M.C.'s neck and chest, and a cut mark on M.C.'s tongue.

**{¶ 62}** After reviewing the record, we conclude that the conviction for Felonious Assault was not against the manifest weight of the evidence. The Second Assignment of Error, therefore, is overruled.

## IV. Conclusion

**{¶ 63}** All of Holley's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, P.J. and TUCKER, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Lynne R. Nothstine
Byron K. Shaw
Hon. Barbara P. Gorman