[Cite as *State v. Cargle*, 2019-Ohio-1544.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28044 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-3685/1 |
| | : | |
| JAMES CARGLE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of April, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Beavercreek, Ohio 45434
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, James Cargle, appeals from his conviction and sentence in the Montgomery County Court of Common Pleas after a jury found him guilty of rape, felonious assault, and three counts of kidnapping. In support of his appeal, Cargle contends that there was insufficient evidence to support his felonious assault conviction. Cargle also contends that his rape conviction and two of his kidnapping convictions should have merged into a single conviction at sentencing pursuant to the allied-offenses doctrine. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On December 7, 2016, the Montgomery County Grand Jury returned a four-count indictment charging Cargle and his co-defendants, Cassidy Lake and Jennifer Rice, with rape in violation of R.C. 2907.02(A)(2), felonious assault in violation of R.C. 2903.11(A)(1), kidnapping to engage in sexual activity in violation of R.C. 2905.01(A)(4), and kidnapping to facilitate a felony or flight thereafter in violation of R.C. 2905.01(A)(2). Following his indictment, Cargle filed a motion to sever his case from that of his two co-defendants. The trial court granted the motion to sever, thus permitting Cargle to be prosecuted separately. Thereafter, a second indictment was issued against Cargle, charging him with kidnapping to terrorize in violation of R.C. 2905.01(A)(3).

{¶ 3} On April 30, 2018, the matter proceeded to a five-day jury trial. At trial, the State presented testimony from several witnesses and introduced over 90 exhibits. The witnesses included, but were not limited to, the two victims, R.R. and A.M., and Cargle's

two co-defendants, Lake and Rice.   The following is a summary of the pertinent witness testimony.

{¶ 4} R.R., the victim with respect to the kidnapping to terrorize charge, testified that Cargle was her pimp while she worked as a prostitute between February and August 2016.   R.R. testified that she and Cargle also had an on-and-off-again sexual relationship.   R.R. claimed that she terminated her working relationship with Cargle after he assaulted her and attempted to run her over with his car.   Due to that assault, R.R. pressed charges against Cargle.   R.R. testified that Cargle became angry at her when she refused to recant her statement to police.

{¶ 5} Despite their tumultuous relationship, R.R. testified that she and Cargle decided to meet for drinks in downtown Dayton, Ohio, on the night of November 25, 2016. After having a few drinks, R.R. testified that she and Cargle went to a house on Sheridan Avenue in Dayton.   R.R. claimed that she had never been to the house before and that Cargle said the house belonged to his aunt.

{¶ 6} After arriving at the Sheridan Avenue residence, R.R. testified that she and Cargle began kissing and "fooling around" in the bedroom.   During this time, R.R. testified that two women with masks covering their faces stormed into the bedroom. According to R.R., the two women tased her, maced her, and forced her down into the basement.   R.R. testified that, although she yelled for Cargle to get the two women off her, Cargle made no real effort to help.

{¶ 7} Once in the basement, the two women zip-tied R.R.'s wrists together and forced R.R. into a large, wire dog cage.   R.R. testified that the women also zip-tied her already bound wrists to a chain that was attached to a dumbbell outside the cage.   The

two women then put a blanket over the cage and started playing loud, "menacing" music. R.R. claimed that she was terrified and had no idea what was going on.

{¶ 8} R.R. testified that four to five different women interacted with her during her entrapment. R.R. claimed that the women kicked the cage countless times and that the cage toppled over while she was trapped inside. R.R. also testified that when she had to relieve herself, the women would remove the zip ties from her wrists and make her urinate in a plastic cup. R.R. also specifically recalled a women asking her about the contacts in her cell phone. R.R. testified that she was truthful about all of her contacts except for the name of her child's father. As a result of lying about her child's father, R.R. testified that the women took her out of the cage and beat her. As part of this beating, R.R. testified that one of the women poured one of the urine-filled plastic cups over her head.

{¶ 9} After being trapped in the cage for two nights, R.R. noticed that the zip ties around her wrists were not properly secured. This permitted R.R. to slip out of the zip ties and free her hands. R.R. testified that, at that time, the cage was toppled over against the wall and was no longer covered by the blanket. R.R. also testified that the cage's door was bent from the women kicking it, which allowed her to wriggle out of the cage. Once she was out of the cage, R.R. was able to sneak out the backdoor of the house. After escaping, R.R. contacted the police.

{¶ 10} Although R.R. testified that the two women who initially accosted her wore masks, R.R. was nevertheless able to recognize one of the women as Jennifer Rice. Rice, a friend of Cargle's, also testified at trial. As part of her testimony, Rice admitted to being present when Cargle and R.R. arrived at the Sheridan Avenue residence on the

night of November 25, 2016. Rice testified that, at that time, she was in the basement of the residence smoking meth with her friend Sonja. Rice claimed that while she and Sonja were in the basement, Cargle texted her instructions to grab R.R. from the bedroom and to put R.R. in the basement. Rice admitted to following Cargle's instructions.

{¶ 11} Rice testified that she and Sonja went upstairs to the bedroom wearing masks, pepper sprayed and fired a stun gun at R.R., and forced R.R. into a dog cage in the basement. Once R.R. was in the cage, Rice testified that she and Sonja continued to smoke meth in the basement while kicking the cage throughout the night. Rice testified that Sonja left the Sheridan Avenue residence the following morning and did not return.

{¶ 12} After Sonja left, Rice testified that Cassidy Lake and Lake's friend Allison arrived at the Sheridan Avenue residence. Lake, who also testified at trial, claimed that the Sheridan Avenue residence belonged to her and her ex-boyfriend. Lake, however, testified that she had swapped houses with Cargle and that she was actually living at Cargle's house in Riverside, Ohio. Lake testified that she went back to the Sheridan Avenue residence on November 26, 2016, because she had an argument with her ex-boyfriend. Lake claimed that when she arrived at the residence, she went down in the basement with Rice and observed a girl, R.R., inside a dog cage that was covered by a blanket.

{¶ 13} Lake testified that Cargle was also at the Sheridan Avenue residence. Lake claimed that Cargle told her R.R. was inside the cage because of money. Lake also claimed that Cargle instructed her to ask R.R. about the contacts in her cell phone so that he could extort money from one of the contacts. Lake testified that Cargle

threatened her children and told her that, if she did not follow his instructions, he would put her in the cage with R.R.

{¶ 14} Lake and Rice both testified that the second victim, A.M., arrived at the Sheridan Avenue residence on the night November 26th. A.M., who also testified at trial, claimed that when she first arrived, Cargle threatened her and said that if she wanted to see her daughter again, she would follow his instructions. Thereafter, A.M. went down to the basement with Lake and Rice, who showed her R.R. in a dog cage. A.M. then went back upstairs where Cargle handed her a list of names and told her to ask R.R. who the names were and how R.R. knew them. A.M. testified that she followed Cargle's instructions because she was scared.

{¶ 15} In following Cargle's instructions, A.M. testified that she simply read the names on Cargle's list while Lake and Rice kicked and flipped the cage containing R.R. A.M. also testified that Rice and Lake pulled R.R. out of the cage and started hitting and kicking R.R. when R.R. did not provide the information Cargle wanted. Lake, however, testified that all the women, including A.M., participated in kicking and flipping the cage. Lake also testified that her friend Allison poured urine on R.R. and kicked R.R. in the face.

{¶ 16} After R.R. refused to answer Cargle's questions, the women went back upstairs, and Cargle told A.M. it was her responsibility to watch R.R. for the night. Lake and Cargle then went to sleep in the bedroom while A.M. and Rice stayed in the living room, where they smoked and snorted meth. Lake testified that her friend Allison left the Sheridan Avenue residence later that night and did not return. A.M. testified that she stayed awake all night while everyone else was sleeping.

{¶ 17} Lake and Rice testified that they woke up the next morning to Cargle yelling

and screaming because R.R. had escaped. A.M. also testified that Cargle was angry and blamed her for R.R.'s escape. All three women testified that Cargle and Lake went looking for R.R. in Lake's maroon Pontiac Grand Prix while A.M. and Rice stayed behind at the Sheridan Avenue residence. Lake and Rice testified that Cargle later contacted Rice and instructed her and A.M. to meet up with him and Lake. Rice thereafter drove A.M. to a detached garage located on Fountain Avenue in Dayton, where they met with Cargle and Lake.

{¶ 18} Once at the Fountain Avenue garage, A.M., Lake, and Rice testified that Cargle shut the garage door and began yelling at A.M. for letting R.R. escape. A.M. testified that Cargle then tackled her to the ground, grabbed her neck, sat on top of her, and hit her all over her body. Lake similarly testified that Cargle picked A.M. up by the neck and threw her to the ground. Rice also testified that Cargle punched A.M. in the face and knocked her down. All three women testified that Cargle then threatened to make Lake and Rice "bleed" if they did not make A.M. "bleed." Rice and Lake both admitted to beating A.M. in response to Cargle's threat.

{¶ 19} A.M., Lake, and Rice testified that, following this beating, Cargle picked up a wooden board in the garage and used it to hit A.M. in the back of the head. A.M. testified that the blow to her head caused her to see white and almost pass out. Rice also testified that, after Cargle struck A.M. with the board, A.M.'s eyes rolled in the back of her head and A.M. almost passed out. Lake also recalled A.M. falling to the floor after the blow to her head.

{¶ 20} After Cargle hit A.M. in the head with the board, Cargle instructed Lake and Rice to strip A.M. naked. Lake and Rice complied with Cargle's command because they

were afraid of what he might do to them. After Lake and Rice stripped A.M. naked, Cargle poured antifreeze on A.M. All three women testified that Cargle then ordered Lake and Rice to tie A.M. up with a rope and to put her in the back of an SUV that was parked in the garage.

{¶ 21} Once A.M. was moved to the back of the SUV, Cargle handed Lake an object, later identified as a rusty window weight, and ordered Lake to ram it inside A.M.'s vagina while Rice held her down. A.M. testified that Cargle first told Lake to put the window weight inside her rectum; however, when both Lake and Cargle were unsuccessful in doing so, Cargle had Lake ram the window weight into her vagina multiple times.

{¶ 22} The three women testified that Cargle then ordered Lake and Rice to put A.M. in the trunk of Lake's Pontiac. Still scared, Lake and Rice testified that they complied with Cargle's order. After placing A.M. in the trunk, Lake and Cargle drove away in the Pontiac while Rice left the Fountain Avenue garage in a separate vehicle. As Lake and Cargle drove from the garage, A.M. was able to free her hands and reach the trunk release. A.M. testified that she pulled the trunk release, jumped out of the trunk, and landed in the road, where she was assisted by bystanders who called 9-1-1.

{¶ 23} A.M. was taken by ambulance to the hospital, where she was treated for several abrasions, road rash, and a severe head injury. A.M. testified that she had gashes in the back, front, and side of her head that required approximately 100 staples. A.M. testified that the injury to the back of her head was where Cargle had struck her with the wooden board. An examination by a sexual assault nurse examiner further revealed that A.M.'s vagina and rectum were severely red and swollen and that A.M. had blood

pooled in her vaginal vault.

{¶ 24} After being treated at the hospital, A.M. directed police officers to the Fountain Avenue garage where her assault took place. Once at the garage, the officers discovered multiple containers of antifreeze, several 1x4 wooden boards, and a set of cast-iron window weights. Forensic testing revealed that A.M.'s DNA was present on one of the window weights discovered in the garage.

{¶ 25} Following the presentation of the State's case, the defense did not call any witnesses. The jury deliberated and found Cargle guilty of all five offenses charged in the indictments. The trial court then determined that Cargle's convictions for rape and kidnapping to engage in sexual activity were allied offenses of similar import that merged for purposes of sentencing. The State elected to have Cargle sentenced for rape. Following the State's election, the trial court sentenced Cargle to 11 years in prison for rape, 11 years for kidnapping to facilitate a felony or flight thereafter, 8 years for felonious assault, and 11 years for kidnapping to terrorize. The trial court ordered all of Cargle's sentences to be served consecutively for a total term of 41 years in prison. Cargle was also designated both a Tier II and a Tier III sex offender.

{¶ 26} Cargle now appeals from his conviction and sentence, raising two assignments of error for review.

**First Assignment of Error**

{¶ 27} Under his First Assignment of Error, Cargle contends that the State presented insufficient evidence to support his conviction for felonious assault because the State failed to present evidence establishing that he caused A.M. serious physical

harm.    We disagree.

{¶ 28} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."    *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).    "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt."    (Citations omitted.)    *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997).    "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact."    (Citations omitted.)    *Id.*

{¶ 29} Pursuant to R.C. 2903.11(A)(1), a person commits felonious assault when he or she "knowingly * * * [c]ause[s] serious physical harm to another[.]"    The term "serious physical harm" includes "[a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves *some temporary, substantial incapacity*[.]"    (Emphasis added.)    R.C. 2901.01(A)(5)(c).

{¶ 30} "Temporary unconsciousness constitutes a temporary substantial incapacity, and therefore serious physical harm."    (Citations omitted.)    *State v. Booker*, 2d Dist. Montgomery No. 22990, 2009-Ohio-1039, ¶ 16*.    Accord State v. Holley*, 2d Dist. Montgomery No. 27115, 2017-Ohio-7430, ¶ 54.    "[B]eing rendered unconscious, no matter how brief, qualifie[s] as a 'temporary substantial incapacity,' which satisfie[s] the serious physical harm requirement."    *State v. Spaulding*, 2017-Ohio-7993, 98 N.E.3d

1057, ¶ 13 (6th Dist.), citing *State v. Sales*, 9th Dist. Summit No. 25036, 2011-Ohio-2505, ¶ 19.

{¶ 31} In *State v. Polhamus*, 2d Dist. Montgomery No. 172832, 1999 WL 1124605 (June 18, 1999), this court found that a victim suffered "serious physical harm" under circumstances where the victim was rendered briefly unconscious after he was struck in the head with the handle of a sledge hammer. *Id.* at *4. The blow to the victim's head caused the victim to suffer a gash that required 12 stitches to close. *Id.*

{¶ 32} Similarly, in *State v. Nolan*, 2d Dist. Montgomery No. 12114, 1991 WL 97788 (June 5, 1991), this court found "serious physical harm" where a head injury caused the victim to be "stunned and uncertain as to whether or not he would maintain consciousness." *Id.* at *4. The victim's head injury was the result of him striking his head on pavement after the defendant threw him to the ground. *Id.* The victim sustained abrasions and a laceration above his eye that required six stiches. *Id.* The victim also had to convalesce at home for nine days, during which the victim suffered severe headaches. *Id.*

{¶ 33} In this case, A.M., Lake, and Rice testified that in addition to Cargle instructing Lake and Rice to beat and rape A.M., Cargle himself poured antifreeze on A.M. and hit A.M. on the back of the head with a wooden board. A.M. testified that the blow to her head "about knocked her out" and that "everything went white like [she] was going to pass out." Tr. p. 329. Lake testified that A.M. "fell to the floor" after Cargle hit her. Tr. p. 667. Rice further testified that A.M.'s "eyes rolled back in her head and she was almost passed out." *Id.* at 617-618.

{¶ 34} When describing her injuries, A.M. testified that her "head was gas[h]ed

open in the back and the side and in the front." Tr. p. 341. As a result of the gashes, A.M. testified that she had to have five staples put in the back of her head, two in the front of her head, and approximately 100 on the side of her head. A.M. indicated that the staples remained in her head for approximately one month until they were removed by a medical professional.

{¶ 35} Although it could be argued that the severity of A.M.'s head injury was exacerbated when she jumped out of the trunk of a moving car, A.M. specifically testified that the injury to the back of her head was where Cargle had struck her with the wooden board. The jury, as the trier of fact in this case, was free to believe some, all, or none of A.M.'s testimony. *State v. Watson*, 2d Dist. Montgomery No. 26347, 2015-Ohio-4517, ¶ 36. This includes A.M.'s testimony regarding the cause of the injury to the back of her head.

{¶ 36} The fact that A.M. had to have staples put in the back of her head where Cargle hit her with the board corroborates A.M.'s testimony and indicates that the head wound was quite severe. The severity of A.M.'s head wound was depicted in State's Exhibit Nos. 13 and 14. These two exhibits were photographs that were taken at the hospital where A.M. was treated. The photographs showed the bloodied, stapled gash in the back of A.M.'s head. The photographs also showed that almost all of A.M.'s bleached blonde hair was stained red and matted with blood from the wound.

{¶ 37} When viewing the evidence in a light most favorable to the State, we find that the immense loss of blood, the necessity for staples, and the testimony indicating that A.M. saw white and fell to the ground with her eyes rolling in the back of her head sufficiently indicated that A.M. suffered serious physical harm as a result of Cargle hitting

her on the head. Although the testimony did not indicate that the blow rendered A.M. completely unconscious, it did indicate that, for a brief period, A.M. was substantially incapacitated. We find that this sufficiently evidenced serious physical harm as defined by R.C. 2901.01(A)(5)(c). Therefore, the State did not fail to present evidence of serious physical harm, and a rational factfinder could have found the essential elements of felonious assault proven beyond a reasonable doubt.

{¶ 38} Cargle's First Assignment of Error is overruled.

## Second Assignment of Error

{¶ 39} Under his Second Assignment of Error, Cargle contends that his convictions for rape, kidnapping to engage in sexual activity, and kidnapping to facilitate a felony or flight thereafter should have merged into a single conviction at sentencing pursuant to the allied-offenses doctrine. We disagree.

{¶ 40} We review allied-offenses determinations de novo. *State v. Harmon*, 2017-Ohio-8106, 98 N.E.3d 1238, ¶ 59 (2d Dist.), citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28. "De novo appellate review means that this court independently reviews the record and affords no deference to a trial court's decision." (Citation omitted.) *State v. Kennedy*, 2d Dist. Clark No. 2017-CA-100, 2018-Ohio-4997, ¶ 35.

{¶ 41} Ohio's allied offenses statute, R.C. 2941.25, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be

convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 42} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Supreme Court of Ohio held that if a defendant's conduct supports multiple offenses, the defendant can be convicted of all of the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import; (2) the conduct shows the offenses were committed separately; or (3) the conduct shows the offenses were committed with separate animus. *Id.* at paragraph three of the syllabus and ¶ 31.

{¶ 43} The term animus means "purpose or, more properly, immediate motive." *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979). "Where an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, [a] priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime." *Id.* at 131.

{¶ 44} As previously noted, Cargle contends that his convictions for rape, kidnapping to engage in sexual activity, and kidnapping to facilitate a felony or flight thereafter should have merged pursuant to the allied-offenses doctrine. This court has noted that "[a]ll rapes inherently involve a restraint on the liberty of another, and where the act of rape is the sole unlawful exercise of restraint on the physical liberty of another person, the law is clear that any accompanying kidnapping charge should merge with the

rape charge." *State v. Portman*, 2d Dist. Clark No. 2013-CA-68, 2014-Ohio-4343, ¶ 32, citing *Logan*.

{¶ 45} However, in *Logan*, the Supreme Court of Ohio held that a separate animus for kidnapping exists where (1): "the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense," or (2) "the asportation or restraint of the complainant subjects the complainant to a substantial increase in risk of harm separate and apart from that involved in the underlying crime." *Logan* at syllabus. *Accord State v. Rucker*, 2d Dist. Montgomery No. 24340, 2012-Ohio-4860, ¶ 52.

{¶ 46} "Although *Logan* predates *Ruff*, Ohio courts continue to apply the guidelines set forth in *Logan* in determining whether kidnapping and another offense were committed with a separate animus, in accordance with the third prong of the *Ruff* test." (Citations omitted.) *State v. Sowers*, 2d Dist. Clark No. 2018-CA-58, 2019-Ohio-649, ¶ 18. The guidelines in *Logan* are also reasonable considerations for determining whether the defendant committed kidnapping as separate conduct from other offenses. *State v. Lovato*, 2d Dist. Montgomery No. 25683, 2014-Ohio-2311, ¶ 13, citing *State v. Ware*, 63 Ohio St.2d 84, 406 N.E.2d 1112 (1980).

{¶ 47} Cargle contends his convictions for rape, kidnapping to engage in sexual activity, and kidnapping to facilitate a felony or flight thereafter should have merged into one conviction because they were all based upon the same conduct, i.e., the rape of A.M. While the trial court did merge Cargle's convictions for rape and kidnapping to engage in sexual activity, the trial court did not merge Cargle's conviction for kidnapping to facilitate a felony or flight thereafter. The trial court did not to merge that offense with either the

rape or kidnapping to engage in sexual activity offense because the trial court found that Cargle had A.M. placed in the back of the trunk for purposes of facilitating his flight after the rape.

**{¶ 48}** We note that "[t]o convict a defendant of kidnapping in violation of R.C. 2905.01(A)(2), the kidnapping must either be done to facilitate the felony or to facilitate the flight after the felony." (Citation omitted.) *State v. Bentz*, 2017-Ohio-5483, 93 N.E.3d 358, ¶ 113 (3d Dist.). As noted in *Bentz*:

The element of flight under R.C. 2905.01(A)(2) has not been addressed in any depth. * * * As such, looking to the definition of "flight" in Black's Law Dictionary as well as the definition of "flight" applied in the jury-instruction arena are informative on the issue.

Black's Law Dictionary defines "flight" as "[t]he act or an instance of fleeing, esp. to evade arrest or prosecution." *Black's Law Dictionary* 756 (10th Ed. 2014). Similarly, in the jury-instruction arena, "[f]light means some escape or affirmative attempt to avoid apprehension." *State v. Robinson*, 1st Dist. Hamilton No. C-060434, 2007-Ohio-2388, ¶ 19, citing *State v. Brundage*, 1st Dist. Hamilton No. C030632, 2004-Ohio-6436, ¶ 17. The purpose of a flight instruction is to show that a defendant had a conscious awareness of his guilt because the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt. *See State v. Taylor*, 78 Ohio St.3d 15, 27, 676 N.E.2d 82 (1997). *See also State v. Wilson*, 3d Dist. Allen No. 1-09-64, 2010-Ohio-2294, ¶ 9. "[T]he ' "mere departure from the scene of the crime

is not to be confused with deliberate flight from the area in which the suspect is normally to be found." ' " *State v. Shepherd*, 8th Dist. Cuyahoga No. 102951, 2016-Ohio-931, ¶ 23, quoting *State v. Santiago*, 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, ¶ 30, quoting *State v. Norwood*, 11th Dist. Lake Nos. 96-L-089 and 96-L-090, 1997 WL 663423, *5 (Sept. 30, 1997). To be considered a flight, "it must be clear that the defendant took affirmative steps to avoid detection and apprehension beyond simply not remaining at the scene of the crime." *Id.*, citing *State v. Dunn*, 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138, ¶ 52.

*Bentz* at ¶ 114-115.

**{¶ 49}** In this case, the record indicates that, after A.M. was tied up and raped in the back of Cargle's SUV, A.M. was forced into the trunk of Cassidy Lake's Pontiac and driven away from the scene. Since A.M. was forced into the trunk and driven away *after* the rape was committed, there was a separate, unlawful restraint on A.M.'s physical liberty apart from the rape itself. The purpose of this separate, unlawful restraint facilitated Cargle's flight after the rape because it prevented A.M. from reporting the incident to police. In other words, putting A.M. in the trunk and driving away from the scene constituted an affirmative attempt by Cargle to avoid apprehension.

**{¶ 50}** Furthermore, Lake testified that while she was driving with A.M. in the trunk, Cargle told her that he had to think about where they were going because he was going to have to kill A.M. *See* Tr. p. 671. This statement not only supported the conclusion that Cargle restrained A.M. in the trunk to facilitate his flight after the rape, but also to facilitate another felony, such as murder. "[T]he kidnapping statute [R.C. 2905.01(A)(2)]

does not require that the perpetrator commit the predicate felony; it requires only that the victim be restrained or removed to facilitate its commission." *State v. Rice*, 1st Dist. Hamilton No. C-080444, 2009-Ohio-1080, ¶ 17.   Such is the case here.

{¶ 51} Because the asportation of A.M. in the trunk of Lake's car occurred after the rape was committed, Cargle's offense of kidnapping to facilitate a felony or flight thereafter was committed by separate conduct independent from the rape.   Because the asportation of A.M. in the trunk of Lake's car was for purposes of facilitating Cargle's flight after the rape and his plan to kill A.M., it had a significance that was independent from the rape itself.   In other words, Cargle's offense of kidnapping to facilitate a felony or flight thereafter was committed with a separate animus.   The fact that A.M. was subjected to a substantial risk of increased harm also supported finding a separate animus.   As the record demonstrates, A.M. threw herself out of the trunk of a moving car to escape Cargle, which resulted in injuries independent from the rape.   Had A.M. not escaped as she did, the record indicates that she would have likely been subjected to even greater harm by Cargle.

{¶ 52} Because the offense of kidnapping to facilitate a felony or flight thereafter was committed by separate conduct and with a separate animus, the trial court properly refused to merge the offense of kidnapping to facilitate a felony or flight thereafter with the rape offense or the kidnapping to engage in sexual activity offense.

{¶ 53} Cargle's Second Assignment of Error is overruled.


**Conclusion**

{¶ 54} Having overruled both assignments of error raised by Cargle, the judgment

of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Michael J. Scarpelli
Robert Alan Brenner
Hon. Richard Skelton